## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IMRAN CHAUDHRI, individually, | : | |
| and on behalf of all others similarly | : | Civil Action No. |
| situated, | : | 2:11-CV-05504-SDW-MCA |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| OSRAM SYLVANIA, INC., and OSRAM | : | |
| SYLVANIA PRODUCTS, INC., | : | |
| | : | |
| Defendants. | : | |
| | : | |

---

### MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT UNDER FEDERAL RULE 12(b)(6)

---

Barry R. Eichen
Thomas Paciorkowski
EICHEN CRUTCHLOW ZASLOW & McELROY, LLP
40 Ethel Road
Edison, NJ 08817
Telephone: (732) 777-0100
beichen@njadvocates.com
tpaciorkowski@njadvocates.com

Sidney S. Liebesman
LIEBESMAN LAW, LLC
501 Silverside Road, Suite 2
Wilmington, DE 19809
Telephone: (302) 798-1000

*Attorneys for Plaintiff Imran Chaudhri*
*and the Putative Class*

March 26, 2012

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTORY STATEMENT ............................................................................. 1

STANDARD BY WHICH DECEPTIVE ADVERTISING IS DETERMINED ......................... 2

STANDARD ON A MOTION TO DISMISS ................................................................ 5

LEGAL ARGUMENT ........................................................................................... 6

I.      Plaintiff's Amended Complaint Properly Alleges A Claim Under The New Jersey Consumer Fraud Act ("NJCFA") .................................................................... 6

        A.   Plaintiff's Amended Complaint Properly Alleges Unlawful Conduct ................ 6

        B.   Defendants' "Up To" Claims Are False And Misleading. .................................. 9

        C.   Defendants' Disclaimers On The Back Of The Silverstar Packaging Are Inadequate To Correct The Misleading Representations On The Front Of The Package ......................................................................................................... 11

        D.   Halogen Bulbs Maintain Their Light Output Over Their Lifespan ..................... 14

        E.   Defendants' Definition Of "Brightness" Is *Per Se* Misleading .......................... 16

        F.   Defendants Fail To Disclose To Purchasers That Silverstar Headlamps Have A Significantly Reduced Lamp Life ....................................................................... 18

II.     PLAINTIFF DID NOT RELY ON THE SILVERSTAR ULTRA VIDEO ADVERTISEMENT ......................................................................................... 20

III.    PLAINTIFF'S AMENDED COMPLAINT PROPERLY ALLEGES A CLAIM FOR UNJUST ENRICHMENT ................................................................................... 20

IV.     PLAINTIFF'S AMENDED COMPLAINT PROPERLY ALLEGES A CLAIM FOR COMMON LAW FRAUD ................................................................................. 22

V.      PLAINTIFF'S AMENDED COMPLAINT PROPERLY ALLEGES A CLAIM FOR NEGLIGENT MISREPRESENTATION ............................................................... 23

VI.     PLAINTIFF'S AMENDED COMPLAINT PROPERLY ALLEGES A CLAIM FOR BREACH OF AN EXPRESS WARRANTY ......................................................... 24

VII.    PLAINTIFF IS ENTITLED TO DECLARATORY & INJUNCTIVE RELIEF ........... 24

VIII.   CONCLUSION ............................................................................................... 25

i

## TABLE OF AUTHORITIES

**Cases**

*American Home Products Corp. v. F.T.C.*, 695 F.2d 681, 686 (3rd Cir.1982) ............................. 9

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009) ........................................ 5

*Barry v. Arrow Pontiac, Inc.*, 100 N.J. 57, 69 (1985) ................................................. 3

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ................................................ 5

*Beneficial Corp. v. F.T.C.*, 542 F.2d 611, 617 (3rd Cir.1976) ...................................... 2

*Bosland v. Warnock Dodge, Inc.*, 197 N.J. 543, 557 (2009) .......................................... 6

*Charles of the Ritz Distributors Corporation v. Federal Trade Commission*, 143 F.2d 676, 679 (2d Cir.1944) ........................................................................................ 3

*County of Essex v. First Union Nat. Bank* , 373 N.J.Super. 543, 549-50 (App.Div. 2004) .......... 20

*County of Essex v. First Union Nat. Bank*, 186 N.J. 46, 56 (2006) ................................ 21

*DiSanto v. Best Buy Stores, L.P.*, 2010 WL 3522790, 5 (D.N.J. 2010) ............................... 25

*Donaldson v. Read Magazine*, 333 U.S. 178, 188-89 (1948) ......................................... 2

*F.T.C. v. Direct Marketing Concepts, Inc.*, 624 F.3d 1, 12 (1st Cir. 2010) ...................... 13

*F.T.C. v. Direct Marketing Concepts, Inc.*, 624 F.3d 1, 12 n.9 (1st Cir. 2010) .................. 15

*Feil v. F.T.C.*, 285 F.2d 879, 896 (9th Cir.1960) .................................................. 2

*Fenwick v. Kay American Jeep, Inc.*, 72 N.J. 372, 378 (1977) ........................................ 2

*FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35 (D.C. Cir. 1985) ............................ 13

*FTC v. Standard Education Soc.*, 302 U.S. 112, 116 (1937) ........................................... 3

*Giant Food, Inc. v. F.T.C.*, 322 F.2d 977, 986 (D.C. Cir. 1963) .................................... 11

*Gonzalez v. Wilshire Credit Corp.*, 207 N.J. 557, 576 (2011) ........................................ 6

*H. Rosenblum, Inc. v. Adler*, 93 N.J. 324, 334 (1983) .............................................. 23

*Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). ......................................... 5

*Lee v. Carter-Reed Co., L.L.C.*, 203 N.J. 496 (2010) ............................................... 21

*Lemelledo v. Beneficial Management Corp. of America*, 150 N.J. 255, 264 (1997) ..................... 6

*Liberty Mut. Ins. Co. v. Land,* 186 N.J. 163, 175 (2006) ............................................................ 22

*Matter of Shack*, 177 N.J.Super. 358 (App.Div. 1981) ................................................................. 19

*Matter of Shack*, 177 N.J.Super. 358, 363 (App.Div.1981) ............................................................ 2

*Miller v. American Family Publishers*, 284 N.J.Super. 67, 84-85 (Ch. Div. 1995) ..................... 12

*Montgomery Ward & Co. v. F.T.C.*, 379 F.2d 666, 670 (7th Cir. 1967) ........................................ 2

*Nutronics Corp.,* FTC Docket C-3281 (Jan. 16, 1990) 54 FR 34822-01 ..................................... 10

*Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir.2008) ................................................... 5

*Removatron Intern. Corp. v. F.T.C.*, 884 F.2d 1489, 1497 (1st Cir. 1989) ................................. 11

*Resort Car Rental System, Inc. v. F. T. C.*, 518 F.2d 962, 964 (9th Cir. 1975) ............................. 2

*Thiedemann v. Mercedes-Benz USA, LLC*, 183 N.J. 234, 253 n. 8 (2005).................................... 13

*Ward Laboratories, Inc. v. Federal Trade Com'n,* 276 F.2d 952, 954 -55 (2d.Cir. 1960) ........... 3

**Statutes**

15 U.S.C.A. § 55(a)(1) ................................................................................................................... 9

15 U.S.C.A. 45(a)(2) ...................................................................................................................... 9

N.J.S.A 12A:2-313 ....................................................................................................................... 24

N.J.S.A. 56:8-1 to -195 .................................................................................................................. 6

N.J.S.A. 56:8-2 ............................................................................................................................... 6

**Other Authorities**

Uniform Commercial Code § 2-313 ............................................................................................ 24

**Rules**

Fed. R. Civ. P. 12(b)(6) ................................................................................................................. 5

## INTRODUCTORY STATEMENT

Defendants have engaged in a consumer fraud by misrepresenting the performance characteristics of their SilverStar headlamps.  This is an especially dangerous consumer fraud because of the nature of the products at issue.  Automobile headlamps are one of the most important safety features in an automobile.  It is no surprise that, because of the safety issues, many consumers looking to purchase new headlamps want to buy headlamps with optimal performance.  In this case, Defendants prey upon safety conscious consumers by making it appear, through purported scientific evidence, that their products perform better than they really do.  On the SilverStar headlamp package, Defendants claim that SilverStar headlamps are up to 35% brighter than standard halogen headlights, that consumers can see up to 30% further down road than standard halogen headlights, and that consumers can see up to 35% wider than standard halogen headlights.

But on the back of the package, buried in fine print, is a revelation that the specifications printed on the front of the package are comparing SilverStar headlamps at 100% light output to standard halogen headlamps at only 80% light output. To put that in perspective, that's like Duracell advertising that its battery has 35% more power than Energizer and then having a disclaimer on the back of the package that it is comparing a new Duracell battery at 100% power to a worn Energizer battery at only 80% power, or Goodyear advertising that its tire has 35% more wet weather traction than a Michelin tire and then having disclaimer on back of the packaging that it is comparing a new Goodyear tire to an old worn-out Michelin tire.  That is misleading conduct intended solely to increase sales/revenues.

Defendants' motion to dismiss distorts the facts as alleged in the Amended Complaint and is a desperate attempt to have the case dismissed at a preliminary stage in the proceedings, ignores the applicable standard of review on a motion to dismiss and makes arguments that will be ripe, if at all, in opposition of the yet-to-be-filed motion for class certification – not a motion to dismiss.

## STANDARD BY WHICH DECEPTIVE ADVERTISING IS DETERMINED

The "prime ingredient of deception" is the advertisement's "capacity to mislead." *Fenwick v. Kay American Jeep, Inc.*, 72 N.J. 372, 378 (1977). "Actual deception, proved by deceived consumers, is not necessary: the likelihood of deception or the capacity to deceive is the criterion by which the advertising is judged." *Montgomery Ward & Co. v. F.T.C.*, 379 F.2d 666, 670 (7th Cir. 1967).  "At the same time, evidence that some customers actually misunderstood the thrust of the message is significant support for the finding of a tendency to mislead." *Beneficial Corp. v. F.T.C.*, 542 F.2d 611, 617 (3rd Cir.1976).  "Advertising capable of being interpreted in a misleading way should be construed against the advertiser. . . . the public is not under any duty to make reasonable inquiry into the truth of advertising." *Resort Car Rental System, Inc. v. F. T. C.*, 518 F.2d 962, 964 (9th Cir. 1975).

"Advertisements as a whole may be completely misleading although every sentence separately considered is literally true. This may be because things are omitted that should be said, or because advertisements are composed or purposefully printed in such way as to mislead." *Donaldson v. Read Magazine*, 333 U.S. 178, 188-89 (1948). "It has long been recognized that a half-truth can be as deceptive as a positive misrepresentation." *Matter of Shack*, 177 N.J.Super. 358, 363 (App.Div.1981).  "The skillful advertiser can mislead the consumer without misstating a single fact. The shrewed use of exaggeration, innuendo, ambiguity and half-

2

truth is more efficacious from the advertiser's standpoint then factual assertions. Facts are dull and dangerous; exaggerations are vivid, attractive and privileged." *Feil v. F.T.C.*, 285 F.2d 879, 896 (9th Cir.1960).

"Moreover, advertisements are not to be judged by their effect upon the scientific or legal mind which will dissect and analyze each phrase but rather by their effect upon the average member of the public who more likely will be influenced by the impression gleaned from a quick glance at the most legible words." *Ward Laboratories, Inc. v. Federal Trade Com'n,* 276 F.2d 952, 954 -55 (2d.Cir. 1960). Therefore an advertisement's capacity to mislead should be judged by the effect it has on "the average consumer, not whether it can later be explained to the more knowledgeable, inquisitive consumer." *Barry v. Arrow Pontiac, Inc*., 100 N.J. 57, 69 (1985). "That exceptionally acute and sophisticated readers might have been able by penetrating analysis to have deciphered the true nature of the [advertisement] is not sufficient to bar findings of fraud by a factfinding tribunal. Questions of fraud may be determined in the light of the effect advertisements would most probably produce on ordinary minds. People have a right to assume that fraudulent advertising traps will not be laid to ensnare them. Laws are made to protect the trusting as well as the suspicious." *Donaldson*, 333 U.S. at 189. "The fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced." *FTC v. Standard Education Soc*., 302 U.S. 112, 116 (1937). "The important criterion is the net impression which the advertisement is likely to make upon the general populace." *Charles of the Ritz Distributors Corporation v. Federal Trade Commission*, 143 F.2d 676, 679 (2d Cir.1944).

"The general public has been defined as that vast multitude which includes the ignorant, and unthinking and the credulous, who, in making purchases, do not stop to analyze but too often

3

are governed by appearances and general impressions. The average purchaser has been variously characterized as not straight thinking, subject to impressions, uneducated, and grossly misinformed; he is influenced by prejudice and superstition; and he wishfully believes in miracles, allegedly the result of progress in science. The language of the ordinary purchaser is casual and unaffected. He is not an expert in grammatical construction or an educated analytical reader and, therefore, he does not normally subject every word in the advertisement to careful study." *Beneficial Corp. v. F.T.C.*, 542 F.2d 611, 618 n.11 (3d.Cir. 1976)(quotations and citations omitted); s*ee also Barry v. Arrow Pontiac,* 100 N.J. at 69 ("it is a commonplace that members of the public are often unaware of the technical meanings"); *Charles of the Ritz*, 143 F.2d at 679 ("law was not made for the protection of experts, but for the public- that vast multitude which includes the ignorant, the unthinking and the credulous").

With this standard in mind, it is not necessary that Plaintiff prove Defendants' representations on the SilverStar packaging are false or that anyone was in-fact misled, only that the overall impression created by those representations created a false or misleading impression that could mislead the average consumer. Not only was Plaintiff misled, but so too were major resellers like Walmart. (Decl. of Thomas Paciorkowski, March 26, 2012, Ex. A (Walmart web site advertisement of the SilverStar 9004 head lamps that Plaintiff purchased and no disclosure that the brightness, side road, and down road claims are comparisons based on SilverStar headlamps at 100%  light output and standard halogen bulbs at 80% light output)). As the Third Circuit held in *Beneficial Corp.,* 542 F.2d at 617, "evidence that some customers actually misunderstood the thrust of the message is significant support for the finding of a tendency to mislead."

4

## STANDARD ON A MOTION TO DISMISS

For a complaint to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), it "must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009) (*citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (internal citation omitted).

In evaluating the sufficiency of a complaint, a court must accept all well-pleaded factual allegations contained in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir.2008). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  But, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions [and] [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft*, 129 S.Ct. at 1949.  Defendant bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

Plaintiff's well-pleaded Amended Complaint establishes claims with facial plausibility that allows the Court to draw the reasonable inference that Defendants are liable for the misconduct alleged in Plaintiff's Amended Complaint under the New Jersey Consumer Fraud Act, common law fraud, negligent misrepresentation, and express warranty, and Plaintiff is entitled to remedies including disgorgement, injunctive and declaratory relief.

## LEGAL ARGUMENT

I. **PLAINTIFF'S AMENDED COMPLAINT PROPERLY ALLEGES A CLAIM UNDER THE NEW JERSEY CONSUMER FRAUD ACT ("NJCFA")**

"The Consumer Fraud Act, *N.J.S.A.* 56:8-1 to -195, provides a private cause of action to consumers who are victimized by fraudulent practices in the marketplace." *Gonzalez v. Wilshire Credit Corp.*, 207 N.J. 557, 576 (2011). "The language of the CFA evinces a clear legislative intent that its provisions be applied broadly in order to accomplish its remedial purpose, namely, to root out consumer fraud." *Lemelledo v. Beneficial Management Corp. of America*, 150 N.J. 255, 264 (1997). To allege a cause of action under the NJCFA, a plaintiff must plead "1) unlawful conduct by defendant; 2) an ascertainable loss by plaintiff; and 3) a causal relationship between the unlawful conduct and the ascertainable loss." *Bosland v. Warnock Dodge, Inc.*, 197 N.J. 543, 557 (2009).  Plaintiff's Amended Complaint properly alleges a NJCFA cause of action by pleading unlawful conduct by defendant, an ascertainable loss by plaintiff, and a causal relationship between the unlawful conduct and plaintiff's ascertainable loss.

### A. PLAINTIFF'S AMENDED COMPLAINT PROPERLY ALLEGES UNLAWFUL CONDUCT

Under the NJCFA, unlawful conduct is defined as:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

*N.J.S.A.* 56:8-2.

Plaintiff's Amended Complaint properly alleges unlawful conduct – Defendants misrepresented, concealed, and omitted important, measurable performance characteristics of their SilverStar head lights on the product packaging with the intent that consumers rely on the product packaging when making their purchases. Plaintiff's Amended Complaint alleges that Defendants misrepresented the following measurable performance characteristics that are printed on the front of SilverStar headlight packaging -- "up to 35% brighter" than standard halogen headlights, that consumers can see "up to 30% further down road," and consumers can see "up to 35% wider." (Am.Compl. ¶ 14).  Plaintiff's Amended Complaint also alleges that Defendants failed to disclose prominently on that packaging that the performance characteristics they advertise are comparing SilverStar headlights at 100% light output and standard halogen headlights at only 80% light output.  (Am.Compl. ¶ 17).

Plaintiff's Amended Complaint also alleges that Defendants intended that consumers rely on those specifications when they made their purchase. (Am.Compl. ¶ 13 "Sylvania's intent is that consumers rely on its headlamp packaging when evaluating which headlights to purchase."). Plaintiff's Amended Complaint also alleges that the overall impression of Defendants' message is that purchasers of SilverStar headlamps will experience these measurable performance characteristics if they buy SilverStar headlamps instead of standard halogen headlamps. (Am.Compl. ¶ 16).  In other words, Defendants are creating the misleading impression that if consumers purchase SilverStar headlights instead of standard halogen headlights, they will experience the claimed performance characteristics. *Id*.

Plaintiff's Amended Complaint also alleges that Defendants failed to disclose and concealed that SilverStar headlamps have a substantially reduced product lifespan when compared to standard halogen headlamps. (Am.Compl. ¶ 22 "The SilverStar product family of

7

head lamps have a significantly shorter life span when compared to regular halogen head lamps. The amethyst colored coating on the SilverStar head lamp glass, traps heat inside the capsule, causing the filament to burn out more quickly, thus decreasing the life."; Am.Compl. ¶ 24 "The Silverstar packaging fails to disclose to the purchaser that SilverStar head lamps have a significantly reduced lifespan when compared to regular halogen head lamps. The only reference to product lifespan on the SilverStar packaging is on the back of the package, in small 6 point-type, at the bottom of a paragraph that is also in small 6-point type, where only the most meticulous consumer would observe it. That disclaimer reads, 'Bulbs with greater brightness may require replacement at more frequent intervals.' *See* <u>Exhibit A, packaging of the 9004 SilverStar product Plaintiff purchased</u>. That disclaimer is misleading because it fails to disclose to the consumer that the SilverStar product family will **always** have a significantly reduced product life span when compared to regular halogen head lamps.").

Plaintiff's Amended Complaint provides additional factual support that Defendants not only knew that SilverStar head lights have a significantly reduced life span, but intentionally withheld that reduced life span information from the SilverStar packaging. *(*Am.Compl. ¶ 25 "Even though Sylvania fails to disclose on the SilverStar packaging that SilverStar head lamps will have significantly reduced life when compared to regular halogen head lamps, Sylvania admits that SilverStar head lamps have significantly reduced life on the product package for its XtraVision head lamps. *See* <u>Exhibit D, packaging of Sylvania XtraVision head lamps</u>."); (Am.Compl*.,* Ex. B & C, SilverStar product specifications from Sylvania web site omit lifespan information while Sylvania includes lifespan information on product specifications for its standard halogen bulbs). Therefore, Plaintiff's Amended Complaint properly alleges unlawful conduct under the NJCFA.

8

## B.  DEFENDANTS' "UP TO" CLAIMS ARE FALSE AND MISLEADING.

Defendants argue that because they use the words "up to" as part of the advertised claims on the SilverStar packaging, Plaintiff should not have any reasonable expectation that he would experience those advertised claims with his purchase. (Def. Brief at 13.) Contrary to the Defendants' argument, the Federal Trade Commission ("FTC") which has nationwide enforcement authority to prohibit unfair and deceptive acts or practices[1] including deceptive advertising claims[2] has determined that "'up to' claims are interpreted by consumers to mean they'll likely receive the benefits." (Decl. of Thomas Paciorkowski, Exhibit B, interview of James Kohm, Associate Director of the Enforcement Division at the FTC Bureau of Consumer Protection; Exhibit C, FTC Press Release dated Feb. 22, 2012, "As noted above, the proposed orders require each company to substantiate savings claims that include the words 'up to' – for example, if they claim consumers will save 'up to' a certain amount of money, or achieve energy savings 'up to' a certain amount, it must have competent and reliable scientific evidence to substantiate that all or almost all consumers are likely to achieve the maximum savings claimed." emphasis added).

The Third Circuit has held that the FTC's judgment of a deceptive act or practice is to be accorded great weight by reviewing courts. *American Home Products Corp. v. F.T.C.*, 695 F.2d 681, 686 (3rd Cir.1982) ("an administrative agency which deals continually with cases in the area, the Commission is often in a better position than are courts to determine when a practice is 'deceptive' within the meaning of the Act. This Court has frequently stated that the

---

[1] 15 U.S.C.A. 45(a)(2) grants the F.T.C. nationwide enforcement power to prevent "unfair or deceptive acts or practices in or affecting commerce."
[2] 15 U.S.C.A. § 55(a)(1).

Commission's judgment is to be given great weight by reviewing courts. This admonition is especially true with respect to allegedly deceptive advertising"). In the case at bar, not only did Plaintiff not experience the maximum performance claims Defendants advertised on the SilverStar packaging, Plaintiff did not experience anything close to those claims, and perceived no noticeable difference between standard halogen head lights and the SilverStar product. (Am. Compl. ¶¶ 30-32).

Also, the FTC has determined that it is a deceptive act and practice to make an "up to" claim that is not capable of being realized by all consumers without also disclosing under what circumstances consumers would not realize the advertised claims. *Nutronics Corp.,* FTC Docket C-3281 (Jan. 16, 1990) 54 FR 34822-01 ("It is further ordered, That respondents … in connection with the advertising, labeling, offering for sale, sale or distribution of any automobile retrofit device in or affecting commerce do forthwith cease and desist from making any fuel savings claims which use the phrase 'up to' or words of similar import unless the maximum level of savings or performance claimed can be achieved by an appreciable number of consumers, and, further, in any instances where consumers could not reasonably foresee the major factors or conditions affecting the maximum level of savings or performance, cease and desist from failing to disclose clearly and prominently the class of consumers who can achieve the maximum level of savings or performance.").  In the case at bar, Defendants disclosure falls woefully short of that standard – it neither clearly nor prominently discloses the class of consumers who can achieve the maximum level of performance. The only disclosure made on the SilverStar packaging concerning circumstances by which customers could obtain the maximum advertised results is located on the back of the package, in 6 point type, buried in a paragraph with other similar small type. That disclosure reads "[a]ctual performance may vary by product type,

vehicle model and usage." (Am. Compl, Ex. A).  First, it is unclear what "product type" means. To the extent it means that the 9004 model SilverStar bulb Plaintiff purchased is not capable of producing the maximum level of performance, then the performance claims on the 9004 packaging are *per se* misleading. Second, to the extent Defendant's disclosure claims "vehicle model" is a factor in determining whether or not a consumer will experience the maximum level of performance but also fails to disclose which vehicles will achieve the maximum level, Defendants' disclosure fails as a matter of law. Finally, to the extent Defendants' disclosure claims "usuage" is a factor in determining whether or not a consumer will experience the maximum level of performance, that factor is vague, ambiguous and misleading considering vehicle head lights can only be used in one of two ways – either turned on or off. As a result, Defendants "up to" claims are false and misleading because consumers could not reasonably foresee the major factors or conditions affecting the maximum level of performance and Defendants have not included in their claims under what circumstances consumers would not realize the maximum level of performance.

### C.  DEFENDANTS' DISCLAIMERS ON THE BACK OF THE SILVERSTAR PACKAGING ARE INADEQUATE TO CORRECT THE MISLEADING REPRESENTATIONS ON THE FRONT OF THE PACKAGE

"Disclaimers or qualifications in any particular ad are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression. Anything less is only likely to cause confusion by creating contradictory double meanings." *Removatron Intern. Corp. v. F.T.C.*, 884 F.2d 1489, 1497 (1st Cir. 1989); *see also, Giant Food, Inc. v. F.T.C.*, 322 F.2d 977, 986 (D.C. Cir. 1963) ("Whether a disclaimer which is in small print and set apart from the main body of an

advertisement could ever correct what otherwise would be a deceptive practice, we need not decide. We hold that this particular disclaimer only added to the deceptiveness").

On the front of the SilverStar package are three graphics representing brightness, down road visibility, and side road visibility. (Am. Compl., Ex. A). Within the brightness graphic are the words "up to 35%." Within the down road visibility graphic are the words "up to 30%." And within the side road visibility graphic are the words "up to 35%." It was certainly reasonable for the average consumer and Plaintiff to believe that these advertised performance characteristics were a comparison between SilverStar headlights at 100% light output and standard halogen headlights at 100% light output, and not a rigged comparison between SilverStar headlights at 100% light output and halogen headlights at 80% light output. Nowhere on the front of the SilverStar package do the Defendants inform the consumer that they are comparing SilverStar headlights at 100% light output to standard halogen headlights at 80% light output.

Rather, Defendants' disclaimer is located on the back of the package, buried in a paragraph of small 6 point type, where only the most meticulous reader would read and understand it, and printed so small as to require most consumers to use reading glasses. "If it is not designed expressly for the purpose of minimizing its visibility, the overall layout of the literature certainly enhances that likelihood." *Miller v. American Family Publishers*, 284 N.J.Super. 67, 84-85 (Ch. Div. 1995) ("It is true that in each of defendant's mailings there is at least one piece of literature containing the quoted disclaimer or a similar statement. But it is also true that such language is overwhelmed, and virtually lost, amid the other statements-larger, more colorful, and more dramatic-than the formal disclaimer. In most cases, the disclaimer is approximately one-quarter inch high. It is often in blue, near other letters also in blue. And in almost every case, it is at or near the bottom of the page.… That placement seems consistent

12

with the overall tenor of defendant's presentation as described above: a carefully constructed message which avoids literal misrepresentation while doing everything possible to create an inaccurate and misleading impression.") (cited with approval by the New Jersey Supreme Court in *Thiedemann v. Mercedes-Benz USA, LLC*, 183 N.J. 234, 253 n. 8 (2005)).

Because Defendants' disclaimer (that it is comparing its SilverStar product at 100% light output and a standard halogen at 80% light output) is located on the back of the package, printed in type small enough to require reading glasses, and buried in other small type where only the most meticulous reader would read and understand it, the disclaimer is not prominent enough to avoid the overall misleading impression. *See Miller*, 284 N.J.Super. at 87 ("There is no reason to believe that the rule in this State is or should be any different from that set out by the United States Supreme Court in *Donaldson*, and adopted by virtually every court that has considered the matter: a claim of literal truth will not constitute a defense to a charge that the overall impression created by an advertisement is misleading and deceptive to an ordinary reader. That being so, defendant's references to its claimed disclaimer and the literal truth of its presentations do not constitute defenses to plaintiffs' prima facie showing that defendant has violated the Consumer Protection Act."); s*ee also, FTC v. Brown & Williamson Tobacco Corp.,* 778 F.2d 35 (D.C. Cir. 1985)(small print disclosure cannot save deceptive general claim); *F.T.C. v. Direct Marketing Concepts, Inc*., 624 F.3d 1, 12 (1st Cir. 2010) ("The presence of disclaimers does not provide any more assistance to the Defendants. This court has held that disclaimers or qualifications in any particular ad are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression. Anything less is only likely to cause confusion by creating contradictory double meanings.").

### D.  HALOGEN BULBS MAINTAIN THEIR LIGHT OUTPUT
###     OVER THEIR LIFESPAN

Defendants' attempt to justify comparing their SilverStar bulbs at 100% light output to standard halogen bulbs at 80% light output by citing a false disclaimer buried in the back of the SilverStar packaging. That disclaimer claims that standard halogen bulbs decrease in brightness by 80% or more over the life of the bulb. (Am. Compl., Ex. A "Headlamps dim over time by 20% or more and timely replacement results in increased lighting performance."). Plaintiff's Amended Complaint alleges that this disclaimer is false and that standard halogen bulbs generally maintain their light output over their lifespan. (Am. Compl. ¶ 21).

In response, Defendants argue that Plaintiff's allegation that halogen bulbs maintain their light output over their lifespan defies the "law of thermodynamics." (Def. Memo. at 12). Instead of providing the "law of thermodynamics" that this allegation would violate, Defendants cite a definition of "lumen depreciation" from a glossary on the Lighting Research Center web site and then claim that all light bulbs are subject to lumen depreciation because a definition exists. *Id*. But careful examination of that glossary reveals that the next entry is the definition for "lumen maintenance." (Dec. of Paciorkowski, Exhibit D). In that glossary, "lumen maintenance" is defined as "[t]he ability of a lamp to retain its light output over time." Using Defendants' logic, because there is a definition for "lumen maintenance," all bulbs must have the ability to retain their light output over time. It would defy the "law of thermodynamics" to suggest otherwise.

Notwithstanding the aforementioned, prior to filing the Complaint, Plaintiff's counsel researched the issue, which included contact with the GE Lighting Institute.[3]  The GE Lighting Institute was asked, "Does the light output of a halogen bulb decrease over time, or does it

---

[3] Founded in 1933, the GE Lighting & Electrical Institute at historic Nela Park in Cleveland, Ohio, was the first facility of its type in the world devoted solely to the teaching of lighting.

14

maintain its brightness over its lifespan?" The GE Lighting Institute responded, "In response to your question, typically, the filament type of bulb (Incandescent & Halogen) maintains its light output over it's lifetime." (Dec. of Paciorkowski, Exhibit E).

Moreover,  a paper presented by General Electric Co. over a half a century ago at the National Technical Conference of the Illuminating Engineering Society, September 7-11, 1959, San Francisco, titled, An Iodine Incandescent Lamp with Virtually 100 Per Cent Lumen Maintenance. (Dec. of Paciorkowski, Exhibit F) details the halogen regenerative cycle and the fact that a halogen lamp maintains its light output over its lifetime. Likewise, an article published in the April 2011 edition of the IEEE Spectrum,[4] the trade publication for the Institute of Electrical and Electronics Engineers,[5] provides further support for Plaintiff's allegation and explains how the halogen cycle in halogen lamps permits halogen lamps to maintain their brightness over their lifetime. (Dec. of Paciorkowski, Exhibit I, "This halogen cycle keeps the bulb clean and the light output almost constant over the life of the bulb.").

Because halogen lamps maintain their brightness over their life-span, Defendants' disclaimer comparing their SilverStar headlights at 100% light output to standard halogen headlights at 80% light output is nonsense. See *F.T.C. v. Direct Marketing Concepts, Inc.*, 624 F.3d 1, 12 n.9 (1st Cir. 2010) ("A statement that studies prove a product cures a certain disease,

---

[4] IEEE Spectrum is read by over 385,000 technology professionals and senior executives worldwide in the high technology sectors of industry, government, and academia. Subscribers include engineering managers and corporate and financial executives. Deans and provosts at every major engineering university and college throughout the world are also Spectrum readers. *See* Dec. of Paciorkowski, Exhibit G.

[5] IEEE is the world's largest technical professional society with over 395,000 members in 160 countries. It is designed to serve professionals involved in all aspects of the electrical, electronic and computing fields and related areas of science and technology. *See* Dec. of Paciorkowski, Exhibit H.

followed by a disclaimer that the statement is opinion and the product actually does not cure the disease, leaves an overall impression of nonsense, not clarity.").

At this stage in the litigation, for Plaintiff's Amended Complaint to survive a motion to dismiss, it must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiff has provided more than enough support to show that the allegations are "plausible on its face."

### E.  DEFENDANTS' DEFINITION OF "BRIGHTNESS" IS *PER SE* MISLEADING

Plaintiff's Amended Complaint alleges that Plaintiff perceived no significant difference in brightness between his prior head lamps, the SilverStar head lamps he then purchased, and the new Sylvania standard halogen headlamps he purchased after the Silverstar headlamps burned out. (Am. Compl. ¶ ¶ 29-32). Plaintiff's Amended Complaint also alleges that Sylvania's own published specifications available on its website show that SilverStar headlamps do not have more light output than standard halogen headlamps; but rather, "have the exact same light output -- exactly 700 lumens for low beam and 1200 lumens for high beam with a +/- 15% margin of error. *See* Exhibits B & C." (Am. Compl. ¶ 19).

Defendants argue on page 12 of their Brief that Plaintiff's "subjective perceptions" of the brightness of the SilverStar head lamps is irrelevant because the fine print on the back of the SilverStar packaging contains the following definition of brightness – "Brightness comparison based on coil luminance measurements." (*See* Am. Compl, Ex. A).  Not only does the SilverStar packaging contain no explanation of what "coil luminance measurements" means, to the extent it differs from what the average consumer would understand brightness to be (the observed brightness by the consumer) it has the capacity to mislead and create confusion. *See, Barry v.*

16

*Arrow Pontiac,* 100 N.J. at 69 ("it is a commonplace that members of the public are often unaware of the technical meanings"). And to create further confusion and mislead consumers, Defendants use a different definition of brightness on their Xtravision head lamps than they do on their SilverStar head lamps. (Am. Compl., Ex. D "Brightness based on beam intensity.").

Even though Sylvania's standard halogen bulbs and Sylvania's SilverStar bulbs have the exact same lumens output as represented in Sylvania's own published specifications, Defendants argue that the "lumens" specifications have nothing to do with the brightness of these bulbs. (Def. Memo at 11, "plaintiff conflates 'lumens,' a unit of measure of overall light output, with the correct measure of a headlight's light concentration projected in a given area, known as 'luminance.' Indeed, the packaging itself makes clear that Sylvania is making a comparison based on such light projection characteristics, explaining that the '[b]rightness comparison [is] based on coil luminance measurements.'"). However, a careful reading of the definition of luminance shows that luminance is derived from a bulbs' lumen output.

Using the Lighting Research Center glossary that Defendants previously cited to (*see* Dec. of Paciorkowski, Exhibit D),  luminance is defined as"[t]he photometric quantity most closely associated with the perception of brightness, measured in units of luminous intensity (candelas) per unit area (square feet or square meter)." Luminous intensity is defined as "[t]he luminous flux on a small surface centered on and normal to the direction divided by the solid angle (in steradians) that the surface subtends at the source." And luminous flux is defined as "[l]uminous radiant power, measured in lumens. The overall light output of a lamp or luminaire." In other words, luminance is lumens (overall light output) projected on a surface. Because both the standard halogen and the SilverStar bulbs have the exact same lumens or overall light output, their luminance (overall light output projected on a surface) is identical as well.

Furthermore, the 9004 model head lamp bulb has no mechanism to concentrate light in a projected area. (*See* Am. Compl., Ex. B, picture of 9004 SilverStar headlight).  The 9004 type bulb is similar to the standard household lightbulb in that it projects light in all directions in a 360 degree radius. To project and focus light in the forward direction of a vehicle, the 9004 type bulb relies on the headlamp reflectors contained in the vehicle it is installed in. Therefore, since both the Sylvania SilverStar 9004 head lamp and the Sylvania standard halogen 9004 head lamp have the same lumens or "overall light output," they would also have the same "light concentration projected in a given area" when installed in the same vehicle using that vehicle's light reflectors to project and focus light in the forward direction of a vehicle.

### F.  DEFENDANTS FAIL TO DISCLOSE TO PURCHASERS THAT SILVERSTAR HEADLAMPS HAVE A SIGNIFICANTLY REDUCED LAMP LIFE

It is undisputed that SilverStar head lamps have a significantly reduced lamp life when compared to standard halogen head lamps. (*See* Am. Compl., Ex. D,  Sylvania XtraVision packaging showing bar graph comparing lamp life of standard halogen (four bars) with other head lamps including SilverStar head lamps (one bar)). Even though Sylvania disclosed the significantly reduced lamp life of the SilverStar head lamps on the packaging for its XtraVision bulbs, it did not disclose that information on the SilverStar packaging. (*See* Am. Compl. Ex. A). Instead, the SilverStar packaging contains the words "[b]ulbs with greater brightness may require replacement at more frequent intervals." (*See* Am. Compl. Ex. A, at 2). That revelation is located on the back of the SilverStar package, buried at the bottom of a paragraph of small 6 point type, where only the most meticulous reader would read and understand it, and printed so small to

require most consumers to use reading glasses. If it is not designed expressly for the purpose of minimizing its visibility, the overall layout certainly enhances that likelihood.

What's more, the use of the word "may" is misleading because SilverStar head lamps will always have a significantly shorter lifespan when compared to standard halogen bulbs. *See Matter of Shack*, 177 N.J.Super. 358 (App.Div. 1981). In *Matter of Shack* an optometrist advertised contact lenses at a set price. The advertisement also disclosed that "professional services" were extra. But the advertisement failed to disclose that a prescription or "professional services" were required by customers before they could purchase the contact lenses. The Appellate Division held that the advertisement was deceptive because it failed to disclose that "professional services" were virtually certain to be required.

> We find that defendants' advertisement is misleading in that it fails to disclose that, in the "vast majority of situations," consumers responding to advertisement will need "professional care." In other words, a consumer reading the advertisement knows that "professional care" (whatever it may consist) is not included in the advertised minimum price. The consumer also knows that there will be an "additional" charge for any "professional care" received. What the advertisement does not tell the consumer is that "professional care" is virtually certain to be required. At that point, the consumer is deceived or misled.

*Id*. at 364-65. Likewise, in the case at bar, Defendants' revelation that "[b]ulbs with greater brightness **may** require replacement at more frequent intervals," is misleading because it fails to adequately disclose to consumers, both in unambiguous language and in a sufficiently prominent location on the packaging, that SilverStar head lamps have significantly less useful life when compared to regular halogen head lamps.

## II.   PLAINTIFF DID NOT RELY ON THE SILVERSTAR ULTRA VIDEO ADVERTISEMENT

Plaintiff's Amended Complaint does not allege that Plaintiff relied on the SilverStar Ultra video advertisement. Rather, reference to the SilverStar Ultra video advertisement is included in the Amended Complaint to show a pattern and practice on behalf of the Defendants to mislead consumers about the true nature of the SilverStar line of head lamps, including SilverStar Ultra. Therefore, any arguments by Defendants that Plaintiff's claims based on his reliance on the video advertisement should be dismissed, is improper because Plaintiff has not based any of his claims on his reliance of the video advertisement. *For example, see* Def. Memo at 16, "his CFA claim based on the video advertisement must be dismissed"; *see also* Def. Memo at 19, "plaintiff fails to state a claim of reasonable reliance to the extent that he interpreted the representations … in the video advertisement to mean anything different than what they actually say."

## III.   PLAINTIFF'S AMENDED COMPLAINT PROPERLY ALLEGES A CLAIM FOR UNJUST ENRICHMENT

"A cause of action for unjust enrichment requires proof that defendant received a benefit and that retention of that benefit without payment would be unjust. The most common circumstance for application of unjust enrichment is when a plaintiff has not been paid despite having had a reasonable expectation of payment for services performed or a benefit conferred. … But there are other circumstances in which courts find unjust enrichment applicable. In particular, when corrupt means have been employed to obtain a [] contract, the concept of unjust enrichment has been used to deny the wrongdoer any profit from the transaction and to thereby deter such conduct." *County of Essex v. First Union Nat. Bank* , 373 N.J.Super. 543, 549-50 (App.Div. 2004). "Our case law has long recognized that in analogous circumstances, general principles of equity mandate that the wrongdoer be relieved of any profits." *County of Essex v.*

20

*First Union Nat. Bank*, 186 N.J. 46, 56 (2006) (affirming the Appellate Division holding relating to unjust enrichment/disgorgement).

Defendants argue that Plaintiff fails to state a claim for unjust enrichment "because he does not claim he enriched Sylvania." (Def. Memo at 16). Defendants further argue that "there must be a ***direct relationship*** between the parties or there must be a mistake on the part of the person conferring the benefit." *Id*. In other words, Defendants argue that Plaintiff cannot have a claim for unjust enrichment because he purchased the Sylvania SilverStar headlamps from Walmart and not directly from Sylvania. Defendants' argument is misplaced.

Defendants manufactured, distributed and advertised their SilverStar headlights with the intent that end users such as the Plaintiff would ultimately purchase that product at retail from third-party sellers. It is uncontested that Plaintiff's Amended Complaint alleges that Plaintiff purchased Sylvania's SilverStar headlights at retail at Walmart. Therefore, Defendants were "enriched" when their product was distributed and sold to Plaintiff just as they had planned. Second, the New Jersey Supreme Court has applied unjust-enrichment recently in a case when a consumer purchased the defendant's product through a third-party retailer. *See, Lee v. Carter-Reed Co., L.L.C.*, 203 N.J. 496 (2010).

In *Carter-Reed,* plaintiff filed a class action complaint alleging that the defendant misrepresented the efficacy of its dietary supplement pill. In addition to a NJCFA claim, the *Carter-Reed* complaint also contained a count for unjust enrichment. Like Plaintiff Chaudhri in the case at bar, the *Carter-Reed* plaintiff did not purchase the defendant's product directly from the defendant; but rather, from a third-party retailer. *Id*. at 509 ("[p]laintiff purchased a bottle of ninety pills of Relacore-a thirty-day supply-at a CVS Store in Rahway"). In *Carter-Reed*, the trial court denied plaintiff's motion for class certification. The New Jersey Supreme Court

*reversed*, holding that "the trial court mistakenly exercised its discretion in not granting class certification on plaintiff's Consumer Fraud Act claim. We also vacate the denial of class certification on her unjust-enrichment and express- and implied-warranty claims and direct the trial court to reconsider whether or not class certification is appropriate on those claims." *Id*. at 533-34.

If a cause of action for unjust enrichment cannot stand unless there is a ***direct relationship*** between the parties as Defendants argue, then there would have been no reason for the New Jersey Supreme Court to remand the case back to the trial court to reconsider class certification on the unjust-enrichment claims, because those claims would have been *per se* improper on a class wide basis if improper on an individual basis. A reasonable interpretation of *Carter-Reed* is that unjust-enrichment can be applied in this type of situation where a consumer purchases the defendant's product through a third-party retailer. A direct purchase from the defendant is not necessary to assert a claim of unjust-enrichment.

## IV.   PLAINTIFF'S AMENDED COMPLAINT PROPERLY ALLEGES A CLAIM FOR COMMON LAW FRAUD

"[P]roof of common law fraud requires the satisfaction of five elements: a material misrepresentation by the defendant of a presently existing fact or past fact; knowledge or belief by the defendant of its falsity; an intent that the plaintiff rely on the statement; reasonable reliance by the plaintiff; and resulting damages to the plaintiff." *Liberty Mut. Ins. Co. v. Land*, 186 N.J. 163, 175 (2006).

Defendants argue that the Amended Complaint fails to allege a material misrepresentation. (Def. Memo at 18). As explained in great detail above in *Section I, supra*, Plaintiff's Amended Complaint clearly alleges that Defendants misrepresented the performance

characteristics of the SilverStar head lamps and intentionally withheld information from the product packaging concerning the product's significantly reduced lamp life.

Defendants also argue that Plaintiff's Amended Complaint fails to allege reasonable reliance on Defendants' misrepresentations. (Def. Memo at 19).  But Plaintiff's Amended Complaint clearly alleges that Plaintiff relied on the misrepresentations and omissions on the SilverStar product packaging when he made his purchase. (Am. Compl ¶ 29 "Plaintiff based his purchase of the 9004 SilverStar® head lamps on the representations on the front of the product packaging and the chart on the back of the product packaging as described above."). Furthermore, as explained in great detail above in *Section I, supra*, Plaintiff's reliance on the Defendants' misrepresentations and omissions was reasonable.

### V.   PLAINTIFF'S AMENDED COMPLAINT PROPERLY ALLEGES A CLAIM FOR NEGLIGENT MISREPRESENTATION

"Negligent misrepresentation is a legally sound concept. An incorrect statement, negligently made and justifiably relied upon, may be the basis for recovery of damages for economic loss or injury sustained as a consequence of that reliance." *H. Rosenblum, Inc. v. Adler*, 93 N.J. 324, 334 (1983). Defendants argue that Plaintiff's claim for negligent misrepresentation "fails for reasons similar to the problems afflicting his CFA and common law fraud claims." (Def. Memo at 19).  Specifically, Defendants argue that the SilverStar product packaging did not contain misrepresentations nor was Plaintiff's reliance on the product packaging reasonable. As explained in great detail above in *Sections I & III, supra*, Plaintiff's Amended Complaint properly alleges that the SilverStar packaging contained misrepresentations and Plaintiff reasonably relied on those misrepresentations when he made his purchase.

## VI.   PLAINTIFF'S AMENDED COMPLAINT PROPERLY ALLEGES A CLAIM FOR BREACH OF AN EXPRESS WARRANTY

Under N.J.S.A 12A:2-313 and the Uniform Commercial Code § 2-313, express warranties are created by a seller when:

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

In addition, "It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty." *Id*. As explained in great detail above in *Section I*, *supra*, Defendants made specific, measurable product claims on the package of the SilverStar product. Those "description of the goods" were measurable performance claims which Defendants intended consumers, such as Plaintiff, rely on when they were deciding which head lights to purchase, and thus were "made part of the basis of the bargain." As a result, Defendants created an express warranty that the Sylvania SilverStar head lamps would perform as indicated on the package.  As explained in great detail above in *Section I*, *supra*, the measurable performance claims Defendants intended that consumers rely on were false. Therefore, Plaintiff has properly pleaded an express warranty claim in his Amended Complaint.

## VII.   PLAINTIFF IS ENTITLED TO DECLARATORY & INJUNCTIVE RELIEF

Defendants allege that "Plaintiff's claim for declaratory and injunctive relief fails because he does not afford notice of the specific grounds on which this claim rests." (Def. Memo at 22).

24

As explained in great detail above in *Section I*, *supra*, Plaintiff's Amended Complaint provides more than enough factual detail to give Defendants' notice of the basis of Plaintiff's claims. Defendants also concede that "the granting of declaratory and injunctive relief is dependent on plaintiff's other causes of action and whether the Court allows those to move forward." (Def. Memo at 22). Therefore, if the Court denies Defendants' motion to dismiss any of the counts in Plaintiff's Amended Complaint, it should also deny Defendants' requests concerning injunctive and declaratory relief.

## VIII.    CONCLUSION

At this stage in the litigation, for Plaintiff's Amended Complaint to survive a motion to dismiss, it must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. In addition, "[p]laintiff need not provide all possible facts or prove his entire case at the pleading stage." *DiSanto v. Best Buy Stores, L.P.*, 2010 WL 3522790, 5 (D.N.J. 2010). Here, Plaintiff has provided more than enough support to show that the allegations in the Amended Complaint are "plausible on its face." Plaintiff has also adequately pleaded causes of action pursuant to the NJCFA, common law fraud, negligent misrepresentation, and express warranty with sufficient particularity to survive a motion to dismiss. For the reasons set forth herein, Plaintiff respectfully requests the Court deny Defendants' motion to dismiss in its entirety.

Dated: March 26, 2012                Respectfully submitted,


By:    _____/s_____
       Barry R. Eichen
       Thomas Paciorkowski
       EICHEN CRUTCHLOW ZASLOW & McELROY, LLP
       40 Ethel Road
       Edison, NJ 08817
       Telephone: (732) 777-0100
       beichen@njadvocates.com
       tpaciorkowski@njadvocates.com

       Sidney S. Liebesman
       LIEBESMAN LAW, LLC
       501 Silverside Road, Suite 2
       Wilmington, DE 19809
       Telephone: (302) 798-1000

       *Attorneys for Plaintiff Imran Chaudhri and the Putative Class*

26