John E. Keefe, Jr.
Keefe Bartels, LLC
170 Monmouth Street
Red Bank, New Jersey 07701
(732) 224-9400

Barry R. Eichen, Esq.
EICHEN CRUTCHLOW ZASLOW &
McELROY, LLP
40 Ethel Road
Edison, New Jersey 08817
(732) 777-0100

*Class Counsel for the Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IMRAN CHAUDHRI, DEIDRA ROSS, RICHARD SMITH, LARRY BYRD, DAVID CHRISTOPHER, DEREK HAHN and LEE S. KELLY, individually, and on behalf of themselves and all others similarly situated, | Case No. 2:11-CV-05504 (SDW)(MCA) |
| Plaintiffs, | |
| v. | **CERTIFICATION OF JOHN E. KEEFE, JR.** |
| OSRAM SYLVANIA, INC., and OSRAM SYLVANIA PRODUCTS, INC., | |
| Defendants. | |

I, JOHN E. KEEFE, JR., of full age, hereby certifies as follows:

1.     I am an attorney-at-law of the State of New Jersey and am a Co-Managing Member of Keefe Bartels, LLC ("KB"), Court-appointed Co-Class Counsel to the Class Representatives and the Class.

2.     Exhibit "A" is a true and accurate copy of the Fairness Hearing Transcript, dated March 20, 2015.

3.      Exhibit "B" is a true and accurate copy of the Class Action Settlement Agreement.

4.      Exhibit "C" is a true and accurate copy of the Certification of Norman Swett.

5.      Exhibit "D" is a true and accurate copy of the Certification of Christopher G. Linscott.

I certify that the statements made by me are true and accurate to the best of my knowledge and belief.  I understand that, if any of these statements are willfully false, I am subject to punishment.

Dated:  April 24, 2015                    /s/ John E. Keefe, Jr._____
                                          JOHN E. KEEFE, JR.

# Exhibit "A"

1

1      IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF NEW JERSEY

3

4   IMRAN CHAUDHRI individually,    :        Civil No.
    and on behalf of all others              11-cv-5504-MCA
5   similarly situated,             :
                                             TRANSCRIPT OF
6                    Plaintiff,     :     FAIRNESS HEARING

7              v.                   :

8   OSRAM SYLVANIA, INC. and        :
    OSRAM SYLVANIA PRODUCTS, INC.,
9                                   :
                     Defendants.
10  -------------------------------x

11                                       Newark, New Jersey
                                         March 20, 2015
12

13

14

15  BEFORE:

16       THE HON. MADELINE COX ARLEO, U.S.D.J.

17

18
                                         Reported by:
19                                       CHARLES P. McGUIRE, C.C.R.
                                         Official Court Reporter
20

21

22       Pursuant to Section 753, Title 28, United States
         Code, the following transcript is certified to be
23       an accurate record as taken stenographically in
         the above entitled proceedings.

24

25                            s/CHARLES P. McGUIRE, C.C.R.


                    CHARLES P. McGUIRE, C.C.R.

2

1       APPEARANCES:

2

        KEEFE BARTELS
3       170 Monmouth Street
        Red Bank, New Jersey 07701
4       BY: JOHN E. KEEFE, JR., ESQ.,
            PAUL A. DiGIORGIO, ESQ., and
5           STEVEN T. SULLIVAN, JR., ESQ.
        And
6       EICHEN CRUTCHLOW ZASLOW McELROY & ROSENBERG, LLP
        40 Ethel Road
7       Edison, New Jersey 08817
        BY: BARRY E. EICHEN, ESQ.
8       Attorneys for Plaintiff Chaudhri and the Class

9       BLANK ROME, LLP
        301 Carnegie Center
10      Princeton, New Jersey 08540
        BY: DAVID C. KISTLER, ESQ.
11      And
        KIRKLAND & ELLIS, LLP
12      655 15th Street, N.W.
        Washington, D. C. 20005-5793
13      BY: EUNNICE EUN, ESQ.
        Attorneys for Defendant Osram Sylvania, Inc.

14

15

16

17

18

19

20

21

22

23

24

25

1              THE COURT CLERK:  All rise.

2              THE COURT:  Good morning.

3              Okay.  We're here in Chaudhri vs. Sylvania.

4              Could I have appearances, please?

5              MR. KEEFE:  Good morning, Your Honor.

6              John E. Keefe, Jr. of the law firm of

7     Keefe Bartels, with my colleagues, Paul DiGiorgio and

8     Steven Sullivan, on behalf of Chaudhri and the class.

9              THE COURT:  Okay.

10             MR. EICHEN:  Barry Eichen, Eichen Crutchlow Zaslow

11    McElroy & Rosenberg, on behalf of Chaudhri and the class.

12             THE COURT:  Okay.

13             MR. KISTLER:  Good morning, Your Honor.

14             David Kistler from Blank Rome on behalf of the

15    Defendant Osram Sylvania.

16             THE COURT:  Okay.

17             MS. EUN:  And Eunnice Eun of Kirkland & Ellis,

18    here on behalf of Osram Sylvania.

19             THE COURT:  Okay.  Anyone else in the back of the

20    courtroom, any other folks that need to be identified?

21             MR. EICHEN:  Tom Paciorkowski was with my firm at

22    the beginning of this, and he is a very good CFA lawyer, and

23    he is in the back right here.

24             THE COURT:  Okay.

25             MR. EICHEN:  And?  Anybody else?

1              All right.

2              THE COURT:  Okay.  Have a seat, everyone.

3              All right.  So we're here for a fairness hearing

4    and a final approval of a settlement that had been

5    preliminarily approved -- what was the date?  It was

6    December of two thousand and -- what's the date of the

7    preliminary approval?

8              MR. KEEFE:  December 20 --

9              THE COURT:  '14.

10             MR. KEEFE:  -- '14, yes.

11             THE COURT:  Okay.  So what I'd like to address

12   first is the one and only objector that was received after

13   the close of business last night, a notice of claim.

14             And let me just put a little bit of factual

15   history on the record in terms of dates.

16             A notice went out in the winter and fall, and

17   we'll talk about those specific dates in a minute, but in

18   January, I received a brief in support of approval and

19   attorneys' fees, and I received an objection from one person

20   filed by a lawyer in Pennsylvania by the name of

21   Brent Vullings, and he had a client by the name of Morrison,

22   and Mr. Morrison filed an objection, but, most importantly,

23   filed at the close of business yesterday a notice of motion

24   for leave to file proof of claim.

25             I checked with my clerk, and it appears that it

1    was filed between 4:30 and five o'clock yesterday, and

2    Plaintiff's counsel responded by a letter very late last

3    night, around midnight, to the belated notice of the proof

4    of claim filed by Mr. Vullings on behalf of his client.

5         And he raises some pretty substantial issues that

6    I thought -- he raised issues in his notice of claim.  Those

7    issues were strongly rebutted by Plaintiff's counsel, and

8    I'm going to let them explain in detail in a minute what was

9    in their March 19th letter that was filed late last night.

10        And they conclude with this:  "Mr. Morrison's

11   'Motion' is a highly suspect filing that contains

12   unsubstantiated and baseless claims.  There is no legal

13   support for the motion or the relief that Mr. Morrison

14   seeks.  The utter lack of disregard for the District's Local

15   Rules and long-standing precedent for standing and

16   settlement of class actions establishes that Mr. Morrison

17   and Mr. Vullings do not seek to improve the Settlement or

18   provide added value to the Class.  Instead, it appears that

19   they seek some yet-to-be-disclosed benefit for themselves

20   that prior courts have severely criticized and sanctioned."

21        And it appears that they have appeared, both of

22   them, Mr. Morrison in particular, as objectors in other

23   class settlements.  And I should also note that, as I was

24   advised, Mr. -- and I'll let Plaintiff talk about his

25   background in a moment.

CHARLES P. McGUIRE, C.C.R.

6

1          In any event, because I got the letter and because

2     I got such a strong opposition by Plaintiff's counsel that I

3     just read into the record, I had my law clerk reach out to

4     Mr. Vullings to see if he wanted to participate in today's

5     hearings, since he's not here.  We moved the hearing up a

6     couple of hours because of inclement weather, and I wanted

7     to give him an opportunity to respond to Plaintiff's letter

8     by phone today, and we contacted him, and his answer to my

9     law clerk was that he would rest on his papers.

10          So I take that as a significant waiver of any

11     rights he has or any rebuttal to the claims that Plaintiff's

12     counsel raises, the significant claims, and that's not lost

13     on me that he didn't want to respond, particularly when I

14     gave him an opportunity to respond by phone and he was in

15     his office this morning and declined to do so.

16          So I just wanted to put that on the record, and

17     I'd like to begin with his claim, because I'm inclined to

18     find that he doesn't have standing, that his claim is late,

19     that it is gamesmanship, that he was aware of this case for

20     a very long time, he had a full and fair opportunity to

21     respond and file a claim, represented by counsel at many,

22     many steps in this proceeding, and to wait until last night

23     to file this application and then refuse to even participate

24     today when he was invited to do so by me speaks volumes.

25     And I'm prepared to find that he doesn't have standing, and

CHARLES P. McGUIRE, C.C.R.

1          I'm also prepared, having reviewed the submissions

2     of counsel very carefully, as well as the certification of

3     Mr. Keefe and others, to approve the settlement and to

4     approve the attorneys' fees.

5          But before I do that, I'd like to address

6     Mr. Morrison's objections.

7          Mr. Keefe?

8          MR. KEEFE:  Thank you, Your Honor.

9          So one of the starting points, I believe, for

10    viewing this objector and the objection really starts with

11    Your Honor's approval of our class notice, which is the

12    fundamental concepts of due process.

13         And in this case, Your Honor, the Defendant was a

14    producer of a product but was not the seller of that

15    product, and we, in an attempt to address the notion of

16    ascertainability, which is now a hot-button topic in

17    consumer class cases, we were able to identify the largest

18    retailers of the subject covered products, and we were able

19    to identify the largest retailers that comprised

20    approximately 97 percent of the sales of the covered

21    products.

22         In so doing that, we were able to identify with

23    the cooperation of these third parties and protective orders

24    approximately 1.6 million consumers that bought covered

25    products.  That allowed us as we went through this case to

8

1    develop a settlement paradigm that allowed for direct

2    payment of claims.  We knew who bought the covered products

3    in large measure.  We also, in the event the documents

4    weren't entirely accurate, we went through a very detailed

5    notice publication process, all of which were to benefit not

6    only Mr. Morrison, the objector here, but all of the class

7    members.

8            That notice plan was really worked very carefully

9    based upon the discovery that we took of the Defendant.  We

10   understood how they penetrated the market, we understood how

11   they sold the product, and we modeled the class notice plan

12   to reach anybody that we couldn't give direct notice to.

13           So Mr. Morrison and all of the class members --

14           THE COURT:  Let me stop you for a minute.

15           Remind me how many folks were identified

16   directly and how many --

17           MR. KEEFE:  Sure.

18           THE COURT:  -- opted in in terms of number.

19           MR. KEEFE:  Sure.  All right.

20           So the direct notice plan initially went out to

21   1.6 million consumers who we know bought the covered

22   products.  The notice administrator then received returns of

23   undeliverables due to the time period of the class.  They

24   were able to cure some of those undeliverables, and right

25   about approximately 1.4 million people will receive a check

1    in this case.  Then through our notice publication process,

2    we were able to have those folks file claims, and we have

3    about 80,000 or so in that regard.

4            THE COURT:  Okay.

5            MR. KEEFE:  So Mr. Morrison -- that's the

6    framework through which we put Mr. Morrison's notice.

7            So he files his objection, and in his objection --

8            THE COURT:  The date of that?

9            MR. KEEFE:  February 9th.

10           THE COURT:  Okay.

11           MR. KEEFE:  February 9th, which, by the way, was

12   the last date possible for any objector to file their

13   objection with the Court.

14           It is significant to note that there were only

15   28 opt-outs in this case.  There was only one objection.

16   That is Mr. Morrison, whom I'm going to speak more precisely

17   about.

18           Mr. Morrison filed that application --

19           THE COURT:  Twenty-eight opt-outs out of about

20   roughly 1.5 million when you count in the other 80.

21           MR. KEEFE:  Right, and don't forget that's only as

22   to the people that we're going to send checks to.  The

23   population who received notice, according to our notice

24   provider, they reached 80 percent of the total population.

25           THE COURT:  Okay.

CHARLES P. McGUIRE, C.C.R.

1          MR. KEEFE:  So it's a less than .003 percentage of

2     opt-outs.

3          THE COURT:  Got it.

4          MR. KEEFE:  So with respect to this one objection,

5     at the time he filed it, we noted particular deficiencies in

6     the notice, and that also, too, was on the eve of -- I

7     believe we received it at about 9:30 p.m. on the last -- on

8     the last evening.

9          But that objection did not set forth any standing,

10    and in our opposition to that, we demonstrated to the Court

11    that there was no standing because he doesn't state that it

12    was -- he bought a covered product.  There was two ways to

13    do that under the notice.  If you're going to object, you

14    can, one, submit proof of claim; two, that you can certify

15    that you bought a covered product.  He did neither in the

16    initial application.

17         There were many other deficiencies that we point

18    out to Your Honor in our brief.

19         I took the opportunity to make personal phone

20    calls to Mr. Vullings because we truly didn't understand the

21    objection.  We asked Mr. Vullings if he could tell us

22    whether his client purchased any of the covered products.

23    He complained about certain remedies but did not tell us nor

24    has he as of today told us that he has made multiple

25    purchases of the product.

1            Furthermore, he states -- he does not state in any

2    way, shape or form that he's a class member.

3            So that brings us through our opposition and just

4    the highlights of that to last evening.

5            On the eve of the final approval, which I'll note

6    has been set for months by Your Honor's preliminary approval

7    order, by a very lengthy notice process, we were

8    exceptionally careful to start the notice publication

9    process, which went on for several months.

10            So last night, in preparation for today, my group

11    was together, and we received at approximately, at least my

12    fax when my crew sent it to me was 5:36, so sometime around

13    4 to 5 p.m., we get Mr. Vullings's motion for leave to file

14    proof of claim.

15            I'll note that Mr. Vullings had every opportunity

16    since the filing of our opposition to his objection to

17    attempt to cure --

18            THE COURT:  Just so the record is clear, when he

19    filed his papers in February in response to your motion to

20    approve the settlement and for fees, he never filed the

21    proof of claim.

22            MR. KEEFE:  He never filed the proof of claim.

23            THE COURT:  He just said, I object to the

24    settlement; right?  It was brief.

25            MR. KEEFE:  I object to the settlement, that's

1    correct.

2              THE COURT:  Okay.

3              MR. KEEFE:  And what he continues to do is, he

4    files --

5              THE COURT:  I'm sorry.

6              Is there something you want to add?

7              MR. EICHEN:  You know, I just wanted to say a few

8    things that -- that were -- and Mr. Keefe did a great job in

9    terms of the history.  But he's not a direct-mail recipient,

10   so there's no proof he even ever purchased a product.  He

11   never provided an affidavit --

12             THE COURT:  Saying that I swear under oath that I

13   bought the product.

14             MR. EICHEN:  Right.  Exactly right.  He was in

15   jail for 60 percent of the class period, the opt-out period.

16   So 60 percent of the time.

17             He also sent us a picture of a car he allegedly --

18             THE COURT:  We'll get to that.  That's in the

19   papers that were filed late yesterday evening.

20             MR. EICHEN:  Okay.  And one thing also I just

21   wanted --

22             THE COURT:  So let's just make the record clear.

23             So he files a brief back in February --

24             MR. EICHEN:  Right.

25             THE COURT:  -- through a lawyer --

1              MR. EICHEN:  Correct.

2              THE COURT:  -- saying, I object to the settlement,

3     a pretty standard objection --

4              MR. EICHEN:  Correct.

5              THE COURT:  -- to everything, never having filed a

6     proof of claim.

7              MR. EICHEN:  Correct.

8              THE COURT:  You reply to that.  Everything's been

9     filed electronically.  You file your reply brief on March

10    13th, and you go through and you explain why he doesn't have

11    standing in particular, that he's never filed a notice of

12    claim demonstrating that he is a class member, either --

13    giving documents establishing that he has standing, proof of

14    purchase, or a sworn statement under oath.

15             Instead, on the 19th, he files for the first time

16    a belated notice of claim, and in that notice of claim, he

17    has an affidavit, and let's talk about the affidavit.

18             The affidavit says this in paragraph two.  This is

19    filed electronically, 96-1, yesterday evening:  "I have been

20    in the automotive business repairing automobiles since 1956

21    so going on 59 years.  Chevrolet certified me in 1962 as a

22    mechanic.

23             "I live in Olney, Texas and buy salvaged vehicles

24    and repair them for sale.

25             "In my business I buy hundreds of automobile parts

14

1     each year for the purpose of repairing salvaged vehicles.

2              "The last time I specifically remember purchasing

3     a Sylvania automotive replacement bulb was around 2011 in

4     the Summer because I remember it was very hot.  I purchased

5     a Sylvania automotive bulb at O'Riley's in Graham, Texas for

6     a 2001 or 2002 Chevrolet Cavalier.  However, I did not

7     receive a post card notice."

8              And then he goes on.

9              Actually, I'm going to read the whole declaration

10    for the record.

11             Finally, he says:  "With respect to the objection

12    requirements the Notice states, 'Documentation such as Proof

13    of Purchase or verification under oath that you are a Class

14    Member (see Question 11).'  I then read Question 11 'How can

15    I receive payment?'  Question 11 says, in part, 'You either

16    need to provide proof of purchase (such as a receipt, credit

17    card record, document, or product packaging) or swear under

18    oath that you purchased one of the included Covered

19    Products, for other than resale or distribution to others.'

20    However, Question 11 then states all claims must be

21    submitted, 'online or mail it postmarked no later than

22    November 14th, 2014."  Once I realized I had missed the

23    claims date I did not think there was a point in making the

24    declaration because the claims period had passed."

25             And he attaches a picture of a car with the

1    headlights.

2          And just so the record is clear, Sylvania makes

3    many different kinds of lightbulbs that are not part of this

4    lawsuit; correct?

5          MR. KEEFE:  That's correct.  Our complaint covered

6    what we're calling covered bulbs.  There's many of them.

7          THE COURT:  And other particular kinds of bulbs.

8          MR. KEEFE:  That's correct.

9          THE COURT:  And all he says here is I remember

10   four years ago I purchased a bulb, a Sylvania bulb, and it

11   was hot, so it was in the summer, and he said he bought it

12   at O'Riley's in Graham, Texas.

13         Did you get a list of purchasers of the covered

14   bulb from O'Riley's?

15         MR. KEEFE:  Yes, Your Honor.  What we did was,

16   again, in an attempt to ascertain our class, we took

17   discovery of the Defendant.  The Defendant provided us with

18   -- they are not direct sellers of the product.  We learned

19   who their major retailers were.  We identified those

20   retailers.  We issued subpoenas to those retailers for their

21   data related to purchases of the covered products during the

22   class period.  We were able to negotiate protective orders,

23   and we reviewed literally millions of lines of data.

24         In so doing, we would have, I believe, identified

25   during this purported purchase period from O'Riley's whether

16

1    Mr. Morrison was the purchaser of a covered product.

2              THE COURT:  And he was not.

3              MR. KEEFE:  His name did not come up on any of our

4    data searches.

5              THE COURT:  Okay.  And even in his very late

6    notice of claim, he still hasn't given any proof, other than

7    the picture of a car with lightbulbs in it.

8              MR. KEEFE:  That's right.

9              THE COURT:  And he hasn't sworn under oath that he

10   was a purchaser of this particular covered product.

11             MR. KEEFE:  So he's produced no proof of purchase,

12   and he has not sworn under oath that he purchased a covered

13   product.

14             THE COURT:  And I know there was a point earlier,

15   some period of disability where he was incarcerated during

16   this time?

17             MR. EICHEN:  Yes, 60 percent, quite frankly.

18             THE COURT:  Tell me a little bit more detail about

19   that.

20             MR. EICHEN:  Well, through an investigator, we

21   were able to find that this person has, in fact, objected --

22   he's a serial objector, and in fact, he was in jail for a

23   good period of time during the class notice, 60 percent of

24   the time.

25             THE COURT:  During the class notice, or during the

1      time when the bulbs were being sold?

2                  MR. EICHEN:  The class period.

3                  THE COURT:  Okay.  Okay.

4                  MR. EICHEN:  Okay.  And also, he sent a picture of

5      the car, and as Your Honor is well aware, we have the

6      picture in our submission, which shows the plate.  Through

7      the plate, we were able to make a determination that, in

8      fact, he does not own that vehicle.

9                  THE COURT:  Right, and that's Exhibit 1 to

10     document number 96-1, which is this late-filed document from

11     last night.

12                 And I assume that your argument then is, he was

13     not a consumer, so even if he did purchase it, he wasn't a

14     consumer, he wouldn't be part of the class because he was

15     doing this as part of his commercial industry that he

16     explained as a certified mechanic and he repairs hundreds of

17     cars.

18                 MR. EICHEN:  Yes, he does absolutely not fit

19     within the class definition.  He is, in fact, a reseller,

20     based on his certification.

21                 THE COURT:  And what does the notice require; that

22     it is for your own use, the covered product?

23                 MR. KEEFE:  All persons or entities in the

24     United States who purchased one or more of the covered

25     products at any time during the class period, other than,

1    quote, for resale or distribution to another person or an

2    entity, your preliminary approval order at paragraph three.

3           THE COURT:  Right, and that was to prevent double

4    recovery; right?

5           MR. EICHEN:  That is correct.

6           THE COURT:  Okay.

7           MR. KEEFE:  And to make sure that the truly

8    injured person -- a reseller is not the injured party.

9           THE COURT:  Right, and you wouldn't want him

10   recovering and the person who bought the bulbs recovering as

11   well.

12          MR. KEEFE:  That's right.  That's right.

13          So to highlight what really is -- you know, the

14   lawyers here on the Plaintiff's team worked late into the

15   night to respond to Mr. Vullings, and I'm referring to the

16   letter that we submitted, albeit late last night, but just

17   to highlight for the Court.

18          So on the eve of this fairness hearing, we

19   received the untimely and procedurally substantively

20   deficient motion for leave to file the proof of claim.  We

21   ask that the Court strike it for the following reasons.

22          Really, what this motion starts off by is a

23   surreply without leave of court.  He takes offense to the

24   notion of being called a repeat objector.  The fact of the

25   matter is, in our brief, we call him a repeat objector

1   because he's done it more than once.  He attempts to

2   manufacture membership in the class that simply doesn't

3   exist.  In fact, he clarifies for Your Honor and for us that

4   he, in fact, is not a class member.

5           Also, you know, one of the things when we read --

6   and I've been in the class action bar for a while, and there

7   are sometimes meaningful objections, and you get to

8   understand what the legal bases are.  The original objection

9   stated no rule, nothing under Rule 23, and no case law to

10  support their objection.  So perhaps even at this late hour,

11  we would find some legal arguments about what is purportedly

12  wrong with our settlement.  Yet there is still no case law

13  or authority for this inexcusable and impermissible

14  surreply.

15          Notwithstanding the fact that there is no notice

16  of motion, there's no form of order, and he doesn't comply

17  with the local rules of this Court, we go to the declaration

18  itself, and we note that buying, quote, a bulb does not give

19  one standing.  In the Hydroxy Cut litigation, an objector

20  there had said, I remember buying a diet product, and the

21  Court says, If you didn't buy Hydroxy Cut, then you have no

22  standing.

23          And that's really what Morrison has done here.  He

24  can't give us a proof, he can't give us an actual proof of

25  purchase, and he doesn't swear under oath that he purchased

1    a covered bulb.

2              He also says, you know, I didn't get notice; I

3    didn't get a postcard.

4              Well, there really now seems to be a very good

5    explanation for that:  If you didn't buy a covered bulb, you

6    would not have come up on our data searches and you would

7    not have gotten direct notice.

8              But he did see notice publication, which means

9    that our notice publication was very effective.  He states

10   that, In my business, I buy hundreds of automotive parts

11   repairing salvaged vehicles.  He specifically takes himself

12   out of the class by not defining the covered bulb and

13   suggests strongly that he's in the business of resale and

14   distribution to another entity.

15             The picture shows nothing.  It shows a vehicle

16   that has a headlight in it.  It doesn't show -- it could

17   have been any one of Sylvania's competitors.  It could have

18   been a standard bulb.  We really have no idea.

19             Fourth, he boldly states that he still -- he still

20   states the same thing as he did in his objection, that he

21   doesn't need to file a claim to be an objector.

22             Well, in our opposition to his objection, we cited

23   case law.  I like to think that he would have read that

24   case, and if he wanted to distinguish it, say it's a

25   minority view, done something, but he doesn't; he simply

1    says, That's not so, this is my argument, that a class

2    member does not have to make a claim to have standing.

3              That's just patently false.

4              Specifically, as recently as January of this year,

5    the Toys "R" Us re-opinion on class certification, which

6    Mr. Vullings represents Mr. Morrison's daughter-in-law,

7    Kim Morrison, as an objector in that case -- you'd think he

8    would have read the cases he was involved with -- said that

9    you have to file a claim to have standing.  And, in fact,

10   the Circuit dismissed the objection because of the very flaw

11   that Mr. Vullings again makes on behalf of Mr. Morrison in

12   this case.

13             So what are they doing?  Not really sure,

14   Your Honor, but I will say this:  They still don't get it

15   right.  They still don't establish standing, and they don't

16   establish any meritorious objection should this Court find

17   that there is standing.

18             Specifically, I'll just note for the record that

19   he attacked the notion that expenses should not be

20   reimbursed with fees, he attacked the notion that there

21   should be -- if you're a multiple purchaser, you should get

22   more than one remedy.  Even under his argument -- and no one

23   else objected, even multiple purchasers; they have the right

24   to opt out or object -- no multiple purchaser objected.

25             So he fails to meet any resemblance of any

1    criteria that this Court should consider standing or the

2    merits of his argument.

3         I don't know if I have any other comments to the

4    objector.  Do you?

5         MR. EICHEN:  I think, John, you covered all of it.

6         THE COURT:  Okay.  Well, I think I can dispose of

7    Mr. Morrison quite quickly.

8         I begin by noting he's not a pro se, he's

9    represented by counsel, and counsel should know better than

10   to wait until literally after close of business the day

11   before a fairness hearing to file a brief and a notice of

12   claim.

13        But even if I was to consider that, which I will,

14   in the interests of justice, there's an opposition filed

15   literally at midnight last night.  At 11 o'clock this

16   morning, a call is made to the lawyer, giving him, despite

17   all of these procedural irregularities and complete

18   disregard for our local rules and our rules of procedure, I

19   offered him an opportunity to be heard in the interests of

20   justice, and he declined.  He said he'd rest on the papers.

21   And the papers were strongly, strongly challenged.

22        I looked carefully at the notice of claim, and

23   Mr. Morrison's notice of claim is more relevant for what it

24   doesn't say than for what it says.  What it doesn't say is

25   that he bought the bulb.  He doesn't swear that under oath.

CHARLES P. McGUIRE, C.C.R.

1    What he doesn't say is, Here's my proof of purchase.

2         And the only plausible conclusion from this

3    affidavit is that he does not fit within the class

4    definition.  He makes clear that he is a professional

5    mechanic, he repairs salvaged vehicles as part of a

6    business, and he bought a Sylvania bulb.  That's all he

7    knows, that's all he's sworn to under oath:  I bought a

8    bulb, I'm in the business, I resell cars, and the car I'm

9    attaching it to is a car that is not mine, that is owned by

10   somebody else.

11        The only plausible conclusion I can draw from that

12   is, he is not a consumer.  If I give him every benefit of

13   the doubt under the sun, I can only conclude two things:

14   He's not a consumer, and I don't even think he bought the

15   bulb in question.  If he is in the business, he knows the

16   difference between the covered product and the not-covered

17   product, and he made a choice to put under oath that he

18   bought a Sylvania bulb and made the choice not to swear that

19   he bought a covered bulb.

20        So it's not even a close call on standing here.

21   Putting aside all the procedural irregularities in the

22   interests of justice, he has no standing.  It's not even

23   close.

24        Even if I were to consider him a person with

25   standing and allow him to file a notice of claim, I can't

1    allow him to file the claim out of time because he has not

2    complied with the notice.  And he had a lawyer to help him,

3    and frankly, the notice is pretty basic, and he has chosen

4    carefully to carve himself out of the class of folks by not

5    mentioning the right bulb and by making clear that he's a

6    commercial purchaser.

7            His objections are without merit, the substantive

8    objections that were filed back in February.  He doesn't

9    cite anything other than generic protests about the amount

10   of fees and the class in general.

11           And, most relevant, literally millions of people

12   received notice of this claim, and out of those millions, at

13   least 1.5, no one has objected.  He is the only one.

14           So, given the circumstances, given the situation

15   upon which this objection arises, given that I'm satisfied

16   beyond question that he doesn't have standing here, and even

17   if he did have standing that his substantive objections have

18   no merit, I am going to strike -- I am denying his notice

19   for leave to file a proof of claim, and I am satisfied that

20   the objections that are filed by him are not meritorious.

21           So that takes care of that.  And I wanted to take

22   care of that up front, because I thought it was important to

23   place on the record the history here, a history that's

24   unchallenged because counsel chose not to appear today, even

25   by phone and at my invitation.


CHARLES P. McGUIRE, C.C.R.

1          And given the breadth of the settlement, given the

2      breadth of the notice, I am satisfied that fair notice was

3      given.  Counsel have gone above and beyond to respond to his

4      objection and to really notify as many potential consumers

5      as were possible, beyond what I probably would have required

6      them to do, and that's not lost on me.

7          I reviewed the papers.  Other than Mr. Morrison's

8      objection, I note there are 20 opt-outs, but there are no

9      other objections.

10          And I'm going to go through the Girsh factors and

11      I'm going to go through the fee petition, but I can say that

12      I am satisfied that the settlement here and the request for

13      fees complies with Federal Rules of Civil Procedure, and

14      also, I have no doubt that it's fair and reasonable under

15      the circumstances.

16          And I'd just like to go through everything for the

17      record.

18          Let's start with the final approval of the class

19      settlement.  Mr. Keefe talked about it a little bit earlier.

20      And before I go into the factors, just for the record, I

21      would like him to just set forth in detail -- and I think he

22      touched upon it when we talked about Mr. Morrison, but what

23      it provides, how much money we're talking about, the

24      $30 million, how that breaks down to the claimants, and

25      also, which I think is not insignificant, the change in

1    packaging going forward.

2         So why don't we put that on the record briefly,

3    and then I'll go through the Girsh factors.

4         MR. KEEFE:  Very good.  Thank you, Your Honor.

5         So after extensive discovery, motions to dismiss

6    with Your Honor's case management order where class

7    certification and, in fact, summary judgment was teed up,

8    and without a stay, the parties worked on a dual track to

9    mediate over a several-month period, and ultimately, we were

10   able to settle this case with Mr. Lerner and Greenberg, who

11   I can just say for the record were incredibly well prepared

12   and a pleasure to work with, and they tested, I believe I

13   can say, both sides vigorously in the process.  We were able

14   to settle with a common settlement fund of $30 million, with

15   an agreement that the Defendant would make packaging and

16   warranty changes, and this we're calling nonmonetary relief,

17   as a considerable component of the settlement.

18        The settlement is designed and meets the gravamen

19   of Plaintiff's complaint with respect to Plaintiff's claim

20   of upselling certain products and those performance

21   characteristics both in misrepresentation and in certain

22   omissions.  It was a very hotly contested litigation, as you

23   would expect, given, number one, the stakes, and certainly

24   given the competency of our adversaries.

25        I think the beauty of this deal is that we took

1    very, very seriously what we could best do for consumers.

2    In creating this $30 million settlement fund with these

3    packaging changes, we didn't create an onerous claims

4    process.  We were able to identify consumers through the

5    third-party discovery, through negotiation, we were able to

6    get a direct pay claims process for those people that we

7    identified, and they will take a pro rata share of the

8    settlement fund after Your Honor makes an award of costs and

9    fees.

10           THE COURT:  And that will be approximately how

11   much per consumer?

12           MR. KEEFE:  Approximately $12 per consumer.  And

13   what I'd like to note is that --

14           THE COURT:  Those consumers who either opted in or

15   you just notified will get a check in the mail for $12.

16   It's automatic; right?

17           MR. KEEFE:  It's going to be automatic.

18           THE COURT:  And how much was the retail price of

19   the bulb?

20           MR. KEEFE:  Well, the retail prices varied, but

21   what we did in class certification preparation was, we

22   developed a damage methodology, a methodology that our

23   expert economists had used in other consumer cases approved

24   here in the Circuit that's called a spread damage model.  So

25   we take the price of a standard bulb because there was

1    functionality to that and took a spread between the sale of

2    the covered products and did a cost-averaging methodology.

3    So based upon that, the $12 represents about 70-percent

4    recovery of that spread damage model.

5              THE COURT:  Okay.

6              MR. KEEFE:  Okay?

7              So the $12, it is important, Your Honor, to note,

8    there is no reverter in this case, there is none of those

9    fictitious cy-pres.  If, for example, there is money left

10   over and it's economically feasible to do so, we anticipate

11   there could be a second round to these consumers.  So we

12   understand over the class period people pass away, people

13   move, despite best searches, which our notice administrator

14   has done to identify consumers, there may very well be a

15   second round.  Money that's left over will not be going to

16   Plaintiff's counsel, will not be going to some charity or --

17   that's not the plan, and it's certainly not going to revert

18   to the Defendants.  We're using 12 as a very conservative,

19   so when we look at 70 percent of the spread model, that's a

20   very healthy remedy by way of settlement, and it could go

21   higher.

22             So that is the remedy.  In addition, as Your Honor

23   pointed out, we're very, very proud of the nonmonetary

24   relief that we were able to obtain.  It really goes to the

25   gravamen of our case.  I'm extremely proud, as Plaintiff's

1    counsel, and I'm very grateful to the defense attorneys,

2    that what we talk about in a consumer fraud case is

3    compensation and deterrence:  How do we cure the problem?

4    And, you know, very often, it's only a deterrence and not

5    cash.  Here, we have $30 million of cash and we have

6    deterrence.  And so we're changing the packaging, the

7    Defendant has agreed voluntarily to change the packaging, to

8    remove the icons for improved road distance, improved side

9    road distance, remove or clarify disclaimer language on the

10   front and back of the packaging, increase the font and color

11   size, include a precise number of hours to product, because

12   performance and durability was an issue.

13          And so this nonmonetary relief really was a

14   collaborative effort with, first, we hired experts.  We

15   hired packaging experts, we hired warranty experts, and they

16   were able to negotiate that with the Defendant.

17          And we're not seeking to put any monetary value to

18   that.  We're not trying to figure out what that may mean.

19   But here's what we do know in a nonmonetary way.  We know

20   that it means many of these folks are repeat purchasers.

21   They will be very well informed about what they're getting

22   with these products moving forward.  So that nonmonetary

23   relief in addition to the warranty changes where we move --

24   we asked the Defendant to consider, and they did so,

25   voluntarily, and through the settlement, to enhance their

CHARLES P. McGUIRE, C.C.R.

1    warranty.  In some cases, it expands the warranty provision

2    from 12 to 24 months, and it truly makes it easier for the

3    consumer to navigate through the warranty process with

4    Sylvania.

5         So that, Your Honor, is really the nuts and bolts

6    of the settlement.

7         Your Honor is aware of our notice plan, which I

8    think was terrifically focused but I think appropriately

9    focused.  I mean, I think some of those plans just spend a

10   ton of money on the back page of "Parade" or "USA Today" and

11   don't really focus it to who the consumers are in this case,

12   and through Kinsella Media and Rust, as a result of our

13   discovery and discussions with the Defendant, we got to

14   understand who their target audience was, and you'll see

15   what we put in our papers, that we did, in fact, hit the

16   target audience.

17        So that's the highlights of the case.

18        If you'd like, Mr. Eichen can go through Girsh

19   and --

20        THE COURT:  I'm happy with the Girsh.

21        Anyone else have anything to add?

22        MR. EICHEN:  No, Your Honor.

23        THE COURT:  Okay.  So, thank you, Mr. Keefe, for

24   that background explanation.  I think it was very helpful.

25        And I should note that what you just discussed was

CHARLES P. McGUIRE, C.C.R.

1   certainly very cogently prepared in the brief and the

2   affidavits that were submitted to this Court and filed

3   electronically prior to today's hearing.

4          And as I began today's hearing, I said I was

5   satisfied that final approval should be granted here of the

6   class settlement, and in doing so, I'd like to follow the

7   precedent in the 3rd Circuit and talk a little bit about the

8   Girsh factors and Rule 23.

9          And the 3rd Circuit requires me to consider the

10   requirements of 23(a), numerosity, commonality, adequate

11   representation, and typicality.  I want to go through that

12   briefly because I think it's pretty obvious just from what's

13   been discussed so far.

14          There's no question that this case satisfies these

15   factors.  The proposed class is too numerous for joinder.

16   We're talking about millions of consumers of lightbulbs --

17   headlights, I should say - over 1.6 million.  That factor is

18   easily satisfied.

19          Similarly, there are, if not common, almost

20   identical questions of law and fact common to the class,

21   whether Sylvania misrepresented or omitted material facts

22   with respect to the covered products to assure all consumers

23   got the same covered products, and the gravamen of the case

24   is really the alleged misrepresentations of the marketing

25   and materials.  And that's the same and that's common to

CHARLES P. McGUIRE, C.C.R.

1    everyone in the case, so that commonality is easily

2    satisfied, and for the same reasons, so is typicality.   The

3    class representatives' claims arise out of the same alleged

4    misrepresentations and alleged omissions.   So that's easy.

5         And I'm also satisfied that there's no conflict

6    between the class representatives and the class.   Each of

7    the class representatives purchased one or more of the

8    covered products based on the allegedly deceptive marketing

9    materials.

10        And I think it's clear from Mr. Keefe's

11   presentation this morning that class counsel have invested

12   considerable time and resources in this matter, not just in

13   pursuing this case vigorously from the start, but in

14   retaining the proper experts and consultants to make sure

15   notice was appropriately served to the right group and the

16   right audience, and that careful consideration was given to

17   damage ranges based on the product.   It demonstrates that

18   they have considerable experience in litigating these type

19   of complex class actions, and, on top of all their

20   experience, it is also clear to me that it was really

21   meaningful, and meaningful to the consumers.

22        And so I'm satisfied that the adequacy requirement

23   is satisfied.

24        I'm going to go through the Girsh factors.

25        I'm going to talk about one more:   That 23(b)(3)

1   requires a finding that the class action be superior to

2   other methods available to the fair and efficient

3   adjudication of the controversy.

4           This is not even a close call.  I can't imagine

5   anything other than a class action as the appropriate

6   vehicle to resolve the claims here.

7           23(e) requires a determination that the proposed

8   settlement is fair, reasonable, and adequate.

9           The 3rd Circuit talks about the Girsh factors, and

10  I'll go through them briefly.

11          The first factor is the complexity, expense, and

12  likely duration of the litigation.

13          And class actions without question raise a large

14  number of complex legal issues, and here, a fair amount of

15  discovery had gone forward, some preliminary motions had

16  been filed, and I have no doubt that Plaintiff's counsel

17  would have vigorously litigated this case to conclusion if

18  required to do so.

19          However, given that complexity and expense and

20  likely duration and the risk of every case that goes forward

21  to trial, a settlement guarantees immediate relief for the

22  class and a substantial immediate relief that really causes

23  them to do nothing but open the mail and cash a check, and

24  that factor weighs heavily in favor of final approval.

25          The second factor, reaction to the class

1    settlement, we talked about that at length.  We're talking

2    about a million and a half class members, only 28

3    exclusions, and one untimely class member that we talked

4    about earlier who has not even filed the proper notice of

5    claim.  That, the small number of exclusions and no

6    objections, no meaningful objection, demonstrates to me that

7    this factor militates in favor of approval of the

8    settlement.

9         The third Girsh factor talks about the degree of

10   case development prior to settlement.  And it's not lost on

11   me that the parties did engage in more than a year and a

12   half of discovery related to class certification on

13   Plaintiff's claims.  I know that because I was the

14   Magistrate Judge involved in the case.  There were discovery

15   requests, third-party subpoenas, depositions, and it was at

16   a point with my recommendation that the parties engaged in

17   substantial arm's-length negotiations, and they used

18   topnotch nationally known mediators, and the mediation

19   developed over a period of time, and I'm satisfied that this

20   factor favors settlement.

21        There's always a risk of establishing liability

22   and damages.  Notwithstanding class counsel's faith in their

23   case and their abilities, there's always risks in trial.

24   Sylvania has always denied liability and had many defenses,

25   and damages were unclear, especially given the fact that the

1    lightbulbs did have a use despite the claimed alleged

2    misrepresentation.  So that whole damage analysis also added

3    a lot of risk to going forward, and that factor and the risk

4    here militates in favor of settlement.

5           Risk of maintaining class action status through

6    trial, manageability.  Although manageability is not a

7    concern with settlement classes, differences in state law

8    can complicate certification of a national litigation class.

9    Here, if the class was not certified, there would be few, if

10   any, class members with both resources and financial

11   incentive to pursue claims on their own behalf.  I don't see

12   many folks bringing lawsuits over a relatively inexpensive

13   headlight.  And going forward, if class certification was

14   denied, I have no doubt that consumers would not get the

15   benefit that they're getting today.  And while Plaintiff

16   have pointed out the strength and the likelihood of class

17   certification, that decision was not made, and certainly any

18   decision granting certification would also involve appellate

19   challenges, et cetera.  And so that factor militates in

20   favor of approving the settlement.

21          The range of reasonableness of the settlement in

22   light of the best possible recovery.  Mr. Keefe said it, and

23   I agree with it, that the Court should look at the

24   settlement within a range of reasonableness.  And I am

25   satisfied here that this settlement is extremely reasonable.

1       And when I look at these settlements, I try to step back

2       from everything and look at, what are the claims, and at the

3       end of the day, what is the consumer getting.  And to get 70

4       percent of the value, not have to write a letter, have a

5       check just sent to you -- because this case presented the

6       unique ability to get a list of over 90 percent of the

7       purchasers and their addresses directly through the

8       Defendant, and I know from the certifications here that

9       defense counsel really took great pains to ensure that that

10      list and the addresses were as accurate as possible.  People

11      move, people change, people pass away.  But they went to

12      great lengths to make sure that that list was accurate and

13      that the money would get back into the hands of the people

14      that bought the product.

15              So it's not even close that this factor militates

16      in favor of settlement.  If there wasn't a class action, if

17      they went to trial and they succeeded, it's possible that

18      they would have had 100 percent of recovery as opposed to

19      70, and that's if they went to trial and succeeded.  So if

20      they had to proceed as individual claims, and they had to

21      pay a lawyer, it's not even close to the $12 refund, and it

22      may be more than 12 if there's a second round of

23      distribution, which is a very good result, first thing.  The

24      second thing, as Mr. Keefe said, going forward, the whole

25      case really turned on misrepresentation of the packaging,

1    and there's an agreement by Sylvania for the future to

2    change and to improve its packaging, and that is a change

3    that has great value to the class and to consumers, even

4    those who didn't partake in the settlement.

5           So those two factors together -- Mr. Keefe pointed

6    out there's no reverter; the money will be redistributed in

7    the second round if the money isn't fully disbursed.

8           So that is a great settlement, one of the better

9    ones I've ever seen, frankly, and I am satisfied that the

10   Girsh factors here strongly favor final approval of the

11   proposed settlement.

12          This is a real recovery for class members.

13   They've been waiting for years for a recovery, which may be

14   nothing or around the same amount anyway, and to have that

15   done without any involvement of the class is huge.  It's not

16   only fair and reasonable, but, as Plaintiffs say in their

17   papers, it's a victory for the class.  And that's not even a

18   close call.

19          So I'm going to certify it.  It's not even a close

20   call for me.

21          I went through notice indirectly in a lot of

22   different ways this morning.  I gave preliminarily approval

23   back in August, and postcards went out.  The notices were

24   clear, accurate, easy English, and they discussed the

25   settlement.

1          As Mr. Keefe highlighted, there was an exhaustive

2    publication notice, 30-second television spots on 82

3    different networks.  There was also publication notice in

4    several national magazines that were specifically targeted,

5    not just generic notices to satisfy the Court, but notices

6    that were targeted to magazines and publications that would

7    attract the potential class members:  "ESPN the Magazine,"

8    "Maxim," "Motor Trend," "National Geographic," and "Popular

9    Science."  This wasn't just Mr. Keefe's idea or Mr. Eichen's

10   idea, it was experts' ideas, and that was smart publication

11   notice.  There was also an Internet advertising and an

12   earned media campaign, Internet banner ads, and, of course,

13   the AutoLightClaims.com web site.

14          So for all those reasons, notice was excellent.

15          The _Girsh_ factors are satisfied.  I'm approving

16   the class.

17          Let's talk a little bit about attorneys' fees.  I

18   think Mr. Keefe went through it, and why don't you just talk

19   a little bit about the attorneys' fees.

20          MR. KEEFE:  Sure.  Your Honor, thank you for that

21   opportunity.

22          The application is under a common benefit fund

23   analysis, which is a percentage of the fund, which is the

24   preferred method in cases such as this, in this District and

25   in this Circuit.

1           The one unique factor about this District and this

2      Circuit is still the lodestar crosscheck.  So through that

3      prism, we put the fee application before Your Honor, and

4      with the $30 million common benefit fund, we're requesting

5      33 and a third, a one-third percentage, which is within the

6      range.  The range of a non-megafund case is typically 30 to

7      35 percent.  We've done our own research.  We put that

8      research and case law before Your Honor.  We've hired two

9      experts, Professor Fitzpatrick at Vanderbilt, who is a

10     former Justice Scalia law clerk, who is very well written on

11     the topic.  So our percentage of the one-third is square in

12     that range.

13          However, that's not enough.  We know that our

14     burden is to show you that that percentage fits a reasonable

15     lodestar crosscheck.  That crosscheck approximately would

16     result in a 1. -- I believe a 1.6 multiplier.  And given the

17     result in this case, we think that is on the lower end of

18     the range, but certainly the percentage is right.  So the

19     question is, how does it shape up against the crosscheck.

20          And also, too, as we put in our summaries of time,

21     we spent an inordinate amount of time making sure we could

22     ascertain this class and reviewing a lot of data.  We also

23     hired who I believe were terrific experts, and those experts

24     -- it was approximately two-thirds of our total costs, which

25     at the time we put in the fee application was approximately

40

1    $277,000.  That has gone higher, and those future costs we

2    bear on our own.

3         So in a common fund, the Court looks at

4    percentage.  The question is, is the percentage right.

5    We're right in that middle of that 30 to 35 percent.

6         Taking a look at the thousands of hours at

7    rates -- I will note for the Court that we are not using

8    rates just for our class actions; these are rates that we

9    use in our law firms.  They're rates that we get on

10   retainer.  These are rates that have been approved in this

11   District.  So in looking at the crosscheck, the Court can be

12   confident we certify that those are rates that we use and

13   have been approved for in the past.

14        I can tell you as co-lead counsel with Mr. Eichen

15   we were very careful not to have unnecessary duplication.

16   Quite frankly, we're too small of law firms to do

17   duplication.  If we were looking at documents, we looked at

18   the documents; if we wrote a brief, we were the folks that

19   wrote the brief.  We didn't hire part-time lawyers to help

20   build the lodestar as folks who are critical of class

21   actions do.  This is the hardworking team right here, and

22   I'm very confident that our lodestar in the crosscheck that

23   you would do would be reasonable.

24        With respect to the fee application, the litmus

25   test is the public.  If you find it's reasonable, what would

1    other folks think about it?  The absence of objections to

2    the fee request favors its approval.  And I think just as a

3    matter of clarity for the record, Your Honor made note of

4    the tremendous results of notice.

5         I just want to be clear that the third-party

6    discovery was the third-party discovery of the largest

7    retailers.  Those retailers comprise 97 percent of retail --

8         THE COURT:  That's right.  Of course.

9         MR. KEEFE:  -- and the results are the millions of

10   consumers that we see here today.

11        THE COURT:  What about the incentive awards,

12   Mr. Keefe?

13        MR. KEEFE:  Right.  The incentive awards, again,

14   Mr. Chaudhri was the Plaintiff.  Mr. Chaudhri came to

15   Mr. Paciorkowski at Mr. Eichen's firm, and he worked very

16   carefully with the lawyers in this case and our research,

17   and based upon what he did, we're requesting a $10,000

18   incentive award, since he really and truly was the lead

19   Plaintiff.

20        We make distinctions between the other class

21   representatives for the very simple reason that, although

22   they were cooperative and they did buy covered bulbs and

23   they were prepared based upon a choice of law analysis if we

24   didn't get national certification here that we were going to

25   file another jurisdiction and, in fact, did file in some

1    other jurisdictions, but those folks certainly didn't do

2    what Mr. Chaudhri did.  We think it's reasonable and we

3    think it's appropriate that Mr. Chaudhri -- he did earn with

4    his many hours of work with us the fee award that -- the

5    incentive award we're requesting.

6                THE COURT:  And that's $10,000 for him and $1,500

7    for the others.

8                MR. KEEFE:  That's correct.

9                THE COURT:  How many others are there?  Four?

10               MR. KEEFE:  Let me check our notes.

11               I think there are six.

12               THE COURT:  Six?  Okay.

13               MR. KEEFE:  I had it written down, but I didn't

14   bring it with me.  Yes, we have six.  Six.

15               THE COURT:  Okay.

16               MR. KEEFE:  And so we make the distinction with

17   purpose, Your Honor.  There is clearly division, and they

18   all understood and certified to Your Honor that they

19   understood what we were requesting and why.

20               And I believe, just, again, for the record, that

21   there were 14,600 hours expended by all of the lawyers in

22   this case.  It's a multiplier, as I said, of approximately

23   1.5 to 1.6, all within the ranges, all supported by not only

24   the case law and our experts, but by the litmus test of what

25   the public thinks about this as well.


                    CHARLES P. McGUIRE, C.C.R.

1          THE COURT:  Thank you.

2          Okay.  So, there are two ways to pay attorneys.

3   One is lodestar, one is a percentage.

4          And in the Gunter case, the 3rd Circuit talked

5   about the factors that a court should consider in granting a

6   fee award and the percentage of recovery:  The size of the

7   fund created, the number of persons benefiting from the

8   settlement, the presence or absence of substantial

9   objections, the skill of Plaintiff's counsel, complexity and

10  duration of the litigation, the risk of nonpayment, the

11  amount of time devoted, and awards in other cases.

12         A lot of these factors overlap.  A lot of these

13  factors I've already addressed in large part by discussing

14  the Girsh factors, but there are certain facts I'd like to

15  highlight in approving the fee.

16         Just to reiterate what counsel, Mr. Keefe, just

17  explained, there was a huge initial investigation of the

18  case.  There was a lot of research on complex series of law.

19  There was consultation with experts on liability and damages

20  as well, lots of documents reviewed, and those documents

21  were reviewed in consultation with experts.  There were many

22  mediations, settlement negotiations, and ultimately resulted

23  in the draft of a settlement agreement.

24         I am very satisfied with the quality of the

25  opposing counsel and counsel that are seeking the fee.

CHARLES P. McGUIRE, C.C.R.

1     This case, although I am very aware that Mr. Keefe and

2     Mr. Eichen are from New Jersey firms, it reaffirms my view

3     that the New Jersey lawyers are as good as any lawyers in

4     the country, and the way they have handled this case

5     professionally, in terms of everything from the objectors to

6     the quality of their briefs to the quality of the oral

7     presentations, satisfies me that they are the best at what

8     they do and that they worked very hard for this fee, and

9     that really is, you know, at the core, in a percentage, you

10    look at the amounts, you look at how much fees were earned,

11    and you look at what's a reasonable multiplier, and against

12    that backdrop, you look at what the lawyers did and how good

13    they were at what they did.  I see uneven quality of

14    litigation in Federal Courts all the time, and I always make

15    it a point to commend the lawyers that do the real A-plus

16    work.  And I am satisfied, just from the way you've

17    conducted yourselves from day one before me, that you have

18    worked very hard and diligently and ethically and

19    professionally.  Despite what other people may say about

20    class actions in other contexts, I look at every case

21    separately, I look at lawyers very carefully, and this is a

22    case where the lawyers really did a nice job on both sides,

23    and they worked together the way professionals should work

24    together to solve a complicated case.  And that, really, is

25    at the core is what I looked at as a backdrop to evaluate

1    the factors that are required by the 3rd Circuit.

2            So let me just go through them with a little bit

3    of detail.

4            As I said earlier, the settlement is an

5    outstanding result.  There's a $30 million settlement.

6    Class members are getting a substantial benefit.  There's

7    going to be also a change in packaging, which is really what

8    is at the core of the claims here.

9            There's a deduction for reasonable expenses, and

10   there were many expenses here, particularly consultation

11   with experts, which up until last night it's clear to me

12   that the lawyers were continuing to consult with, and that

13   comes out of their payment, and they did that to make my job

14   easier and to really address every single concern that the

15   Court had, and I appreciate that.

16           There's no reverter for unclaimed funds.  The

17   funds are going back to the folks who were part of the

18   class.  That is a substantial aspect of the settlement.

19           I talked a little bit about experts.  I didn't

20   talk about them by name.  The Plaintiff's counsel retained

21   John Beyer, Ph.D., to prepare an economic analysis of class

22   representative and class damages.  He again had to review

23   lots of documents and discovery as well as other publicly

24   available documents and economic literature about the

25   automotive aftermarket headlights industry, microeconomics,

1    industrial organization, consumer behavior, and based on

2    that, Sylvania agreed, as we talked about many times this

3    morning, to change its marketing information and packaging

4    information.

5         There's no objection to the attorneys' fees here.

6    Lots of people got notice.  Notice was given through a lot

7    of media channels, including television spots, various

8    publications and web site banners, et cetera, and there were

9    no objections.  That I guess we can look at a little bit in

10   a general sense there was an objection by Mr. Morrison, but

11   I dealt with that earlier, and other than him, there has

12   been no objection at all.  That factor militates in favor of

13   approving the attorneys' fees.

14        The risk of nonpayment favors approval of the

15   requested fees as well.  Class counsel faced substantial

16   risk of nonpayment for the motion to dismiss and were

17   vigorously challenged during those motions for class

18   certification and summary judgment.  Sylvania could have

19   prevailed.  There was a lot of steps along the way, a lot of

20   hurdles that were not jumped, and despite those risks, class

21   counsel forged a significant resolution that provides

22   substantial relief to the class.

23        Mr. Keefe talked briefly about the requested

24   percentage of recovery and viewing it against the amount of

25   time devoted to legal services.  After determining the

CHARLES P. McGUIRE, C.C.R.

1    lodestar, the Court may adjust the fee using a multiplier.

2    The lodestar multiplier attempts to account for the

3    contingent work or risks involved in a particular case.

4         Here, class counsel and supporting counsel have

5    certified to their hours and rates in prosecuting this

6    action.  The current lodestar rate was as of a while ago

7    6.5 million, I'm sure that it's more than that now,

8    resulting from 14,600 hours expended by counsel.  The

9    requested attorneys' fees would result in a multiplier of

10   1.5.  This is well within the 3rd Circuit's range.  I should

11   note that the lodestar does not include the time that will

12   be spent going forward in preparing -- did not include -- as

13   I said earlier, the number is even greater because it

14   doesn't include preparing and presenting arguments for final

15   approval, defending the claims raised by Mr. Morrison at the

16   11th hour, so in all likelihood, the multiplier is probably

17   slightly less than 1.5.

18        It's also reasonable compared to other, similar

19   cases.  There's no general rule, as we know.

20        But using the percentage of the fund method, we're

21   at 25, 30, and 33 percent, with only two-thirds of awards

22   between 25 and 50 -- and 35 percent.

23        This range is certainly within the range of other

24   settlements, as demonstrated by the affidavits that I

25   received and reviewed.  It was also consistent with the

1    private marketplace, where attorneys negotiate contingency

2    fee agreements.  If this was not a class action, the

3    customary contingency fee would range from 30 to 40 percent,

4    and that is within the range here.

5              Therefore, I am satisfied that the fee is

6    reasonable.

7              I think that the incentive awards are also very

8    modest and reasonable for the reasons expressed by

9    Mr. Keefe, and I will agree and approve the award for

10   Mr. Chaudhri of $10,000 and class representatives Deidra

11   Ross, Richard Smith, Larry Byrd --

12             Is that the famous Larry Byrd?

13             MR. KEEFE:  It is not, unfortunately.

14             THE COURT:  Okay.  I would like to meet him if he

15   was here.

16             MR. KEEFE:  Still a worthy Larry Byrd.

17             THE COURT:  Okay.  Larry Byrd bought headlights.

18             MR. KEEFE:  That's right.

19             THE COURT:  Okay -- David Christopher, Derek Hahn,

20   and Lee S. Kelly.

21             I will sign the order today, and it will be

22   electronically filed online before the snowstorm hits.

23             Anything further, anyone?

24             MR. KEEFE:  Just one housekeeping item, Your

25   Honor.

1          The objection that was filed last night and which

2     we opposed I believe generated an ECF by the clerk stating

3     that that motion would be returnable in about a month.  I

4     think Your Honor has dealt with that.

5          THE COURT:  Yes, well, I did, and I'll clarify

6     that.  I will do a text order today saying that Mr. Vullings

7     was given notice by my staff today of the necessity to

8     participate in today's hearing and he waived his right to do

9     so, and I'll clarify that with a text order.

10          MR. KEEFE:  Very good.

11          THE COURT:  Okay?

12          MR. KEEFE:  Yes.

13          THE COURT:  Have a great day, gentlemen.  Thank

14     you for coming in.

15          MR. KEEFE:  Thank you very much.

16          THE COURT CLERK:  All rise.

17       (Matter concluded)

18

19

20

21

22

23

24

25

CHARLES P. McGUIRE, C.C.R.

# Exhibit "B"

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

IMRAN CHAUDHRI, individually,
and on behalf of all others similarly situated,

 Plaintiff,

 - against -

OSRAM SYLVANIA, INC., and OSRAM
SYLVANIA PRODUCTS, INC.,

 Defendants.

Civil Action No.
2:11-CV-05504-SDW-MCA

**CLASS ACTION
SETTLEMENT AGREEMENT**

## CLASS ACTION SETTLEMENT AGREEMENT

This Class Action Settlement Agreement ("Agreement") is entered into on this 27th day of June, 2014, by and between the Class Representatives in their individual and representative capacities ("Plaintiffs") and Defendant OSRAM SYLVANIA, INC. ("Sylvania" and, collectively with Plaintiffs, the "Settling Parties"), and their counsel. Each of the Settling Parties stipulates and agrees that, in consideration of the promises and covenants set forth in this Agreement and upon the Court's entry of an Order and Final Judgment granting Final Approval to this Agreement, this lawsuit and the matters raised in the litigation are hereby settled, compromised, and dismissed on the merits and with prejudice, on the terms and conditions set forth herein ("Settlement").

## RECITALS

### I. PROCEDURAL BACKGROUND

WHEREAS, on September 22, 2011, Plaintiff Imran Chaudhri filed a Complaint against Sylvania in the United States District Court for the District of New Jersey, *Chaudhri v. OSRAM*

*SYLVANIA, INC., et al.*, Civil Action No. 2:11-cv-05504-SDW-MCA, seeking certification of a class action asserting claims for breach of the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. §§ 56:8-1, *et seq.*, unjust enrichment, misrepresentation, negligent misrepresentation, and breach of express warranty (the "Complaint"). Dkt. 1.[1]

WHEREAS, on December 5, 2011, Sylvania moved to dismiss the Complaint, Dkt. 7; and

WHEREAS, on January 9, 2012, Plaintiff Imran Chaudhri filed an Amended Complaint, again seeking certification of a class action asserting claims for breach of the NJCFA, common law fraud, unjust enrichment, negligent misrepresentation, and breach of express warranty, Dkt. 11; and

WHEREAS, the Amended Complaint alleges that Sylvania's claims regarding the performance of certain premium automotive lighting produced by Sylvania are and were misleading and deceptive, *Id.*; and

WHEREAS, the Amended Complaint alleges that Sylvania made such representations in advertising and on the packaging of its products to Plaintiffs and other consumers, *Id.*; and

WHEREAS, on February 13, 2012, Sylvania moved to dismiss the Amended Complaint, Dkt. 14, which Plaintiff Imran Chaudhri opposed on March 26, 2012, Dkt. 19; and

WHEREAS, on June 14, 2012, the Honorable Susan D. Wigenton granted Sylvania's motion to dismiss in part and denied Sylvania's motion to dismiss in part, dismissing Plaintiff Imran Chaudhri's unjust enrichment claim but allowing his other claims to proceed, Dkt. 24; and

WHEREAS, on September 7, 2012, the Sylvania and Plaintiff Imran Chaudhri served requests for production of documents and interrogatories on another; and

---

[1]   All citations to "Dkt. __" are to docket entries in the Action.

WHEREAS, Plaintiff Imran Chaudhri responded to Sylvania's requests for production and interrogatories on October 8, 2012, and thereafter, and Sylvania responded to Plaintiff Imran Chaudhri's requests for production and interrogatories on October 12, 2012, and thereafter; and

WHEREAS, to date, Sylvania has produced a substantial amount of documents in response to Plaintiff Imran Chaudhri's requests for production, in addition to voluminous electronic data that is not separately paginated; and

WHEREAS, on December 5, 2012, Plaintiff Imran Chaudhri served Sylvania with two deposition notices pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure; and

WHEREAS, although Sylvania contested the propriety and scope of the 30(b)(6) deposition, Sylvania produced a 30(b)(6) deponent to testify about certain topics on December 21, 2012; and

WHEREAS, on January 24, 2013, Plaintiff Imran Chaudhri served Sylvania with requests for admission, to which Sylvania responded on February 28, 2013; and

WHEREAS, on May 15, 2013, Plaintiff Imran Chaudhri served Sylvania with a second set of requests for admission, to which Sylvania responded on June 17, 2013; and

WHEREAS, on June 7, 2013, Sylvania served Plaintiff Imran Chaudhri with a notice of inspection of his vehicle pursuant to Rule 26 and 34 of the Federal Rules of Civil Procedure, which inspection was conducted on June 13, 2013; and

WHEREAS, on June 11, 2013, Sylvania served Plaintiff Imran Chaudhri's brother, Al Chaudhri, with a subpoena to testify by deposition, which deposition was taken on June 18, 2013; and

WHEREAS, on June 17, 21, and 25, 2013, Sylvania served Plaintiff Imran Chaudhri with requests for admission, to which he responded on July 17, 22, and 25, 2013, respectively; and

WHEREAS, Plaintiff Imran Chaudhri served third-party subpoenas for documents on Sylvania's retailers, which retailers are believed to represent in excess of 90% of the volume of Covered Products distributed in the United States, and received millions of lines of data regarding sales data and class member identification; and

WHEREAS, Sylvania and Plaintiff Imran Chaudhri agreed to mediate their dispute and participated in two days of in-person mediation on December 11 and 12, 2013, before a nationally-recognized mediator (the "First Mediation"), without, however, reaching a settlement agreement; and

WHEREAS, after the First Mediation, Sylvania and Plaintiff Imran Chaudhri, through their counsel, engaged in several settlement discussions by phone and in person between January 2014 and April 2014, without, however, reaching a settlement agreement; and

WHEREAS, Sylvania and Imran Chaudhri agreed to attempt another mediation of their dispute and participated in one mediation session involving Plaintiff Imran Chaudhri's lead counsel only, one mediation session involving Sylvania's counsel only, and two days of joint in-person mediation on May 7 and 8, 2014, before mediators Jonathan J. Lerner, Esq. and Stephen M. Greenberg, Esq. of Pilgrim Mediation Group (the "Second Mediation"); and

WHEREAS, the Second Mediation resulted in an agreement on the principles reflected in this Agreement, which Plaintiffs and Class Counsel believe provides substantial and valuable benefits to the class; is fair, reasonable, and adequate in light of the nature of the claims and risks of litigation; and is in the best interests of Plaintiffs and the Settlement Class Members[2]; and

WHEREAS, Sylvania has denied and continues to deny any wrongdoing or liability in this Action and stands by its products and advertising; and

---

[2]   All capitalized terms not contemporaneously defined are defined herein at Section II.

4

WHEREAS, Class Counsel have conducted an investigation, which included discovery of Sylvania's advertising and marketing referred to in the Amended Complaint and an examination of the facts and law relating to the claims against and the defenses of Sylvania; and

WHEREAS, based upon the discovery taken to date, investigation, and evaluation of the facts and law relating to the matters alleged in the pleadings, and assistance of mediators, the Settling Parties have agreed to settle the claims asserted in the Action pursuant to the provisions of this Agreement, after having considered numerous risks of continued litigation and other factors, including but not limited to:

A. The complexity, expense and likely duration of litigating the Action;

B. The current stage of proceedings in the case;

C. The risks of establishing liability;

D. The risks of establishing damages;

E. The risks of maintaining the class action through trial;

F. The uncertainty of outcome at trial and the possibility of an appeal by either side following trial;

G. The substantial benefits being made available to Plaintiffs and the Settlement Class Members under the terms of this Agreement; and

WHEREAS, weighing the above factors, as well as all other risks and uncertainties of continued litigation and all factors bearing on the merits of settlement, the Settling Parties are satisfied that the terms and conditions of this Agreement are fair, reasonable, adequate, and in the best interests of Plaintiffs and the Settlement Class Members; and

WHEREAS, Sylvania expressly disclaims any liability or wrongdoing of any kind whatsoever, but nevertheless considers it desirable that the Action be resolved upon the terms

and conditions set forth in this Agreement in order to avoid the expense, risk, uncertainty, and interference with ongoing business operations inherent in any litigation, and to put to rest and obtain its peace, forever, from all claims that will be barred by the releases described herein;

NOW, THEREFORE, subject to and conditioned on the Court's Final Approval, as required herein and by applicable law and rules, the Settling Parties agree, in consideration of the mutual promises and covenants contained herein, that any Released Claims against Sylvania shall be settled, compromised, and forever released upon the following terms and conditions.

<u>TERMS AND CONDITIONS OF SETTLEMENT</u>

II.    DEFINITIONS

1.    As used in this Agreement and the exhibits attached hereto, in addition to any definitions set forth elsewhere in this Agreement, the following terms shall have the meanings set forth below:

A.    "Action" means the civil action filed under the caption *Chaudhri v. OSRAM SYLVANIA, INC., et al.* Civil Action No. 2:11-CV-05504-SDW-MCA, in the United States District Court for the District of New Jersey.

B.    "Cash Settlement Amount" shall be the $30,000,000 which shall be deposited by Sylvania into the settlement fund as described in Paragraph 22 of this Agreement on the terms and conditions set forth herein.

C.    "Claim Form" means the document in the form of Exhibit A hereto (which is incorporated herein), but which may be modified as necessary to comply with the provisions of any order of Preliminary Approval entered by the Court.

D.    "Claimant" means a Settlement Class Member who: (1) can be identified in records produced in the Action for the Class Period; or (2) submits a claim to the Claims Administrator.

6

E.     "Claims Administration Expenses" means the expenses incurred by the Claims Administrator, among other things, in the publication of Class Notice, establishment and maintenance of the Settlement Website and other communication and notice methods with Settlement Class Members, and the processing, handling, reviewing, and paying of claims made by Claimants.

F.     "Claims Administrator" means the Person selected by the Settling Parties and approved by the Court to oversee, among other things, publication of Class Notice, the Settlement Website, and other communication and notice methods with Settlement Class Members, and the processing, handling, reviewing, approving, and paying of claims made by Claimants.

G.     "Claims Period" means the time period during which Settlement Class Members may submit Claim Forms, which shall be limited to the sixty (60) days (not including the day of the event) following the later of (i) the initial publication of the Class Notice; (ii) establishment of the Settlement Website; or (iii) completion of direct notice to those who can be identified in records produced in the Action for the Class Period.

H.     "Class Counsel" means Barry R. Eichen, Esq. from the law firm Eichen Crutchlow Zaslow & McElroy, LLP and John E. Keefe, Jr., Esq. from the law firm Keefe Bartels, LLC.

I.     "Class Notice" means the Court-approved notices of this Agreement that are directed to Settlement Class Members.

J.     "Class Period" means any date from September 22, 2005 through the date of Preliminary Approval.

7

K.     "Class Representative" means one or more individuals who were named or have been proposed to the Court to be named in this Action as plaintiffs for purposes of settlement, and includes Imran Chaudhri, Lee S. Kelly, Derek Hahn, David Christopher, Larry Byrd, Richard Smith, and Deidra Ross.

L.     "Court" means the United States District Court for the District of New Jersey.

M.     "Covered Products" means (i) SilverStar® ULTRA, SilverStar®, XtraVision®, or Cool Blue® replacement headlight capsules; (ii) SilverStar®, XtraVision®, or Cool Blue® sealed beam headlights; or (iii) SilverStar® fog or auxiliary lights.

N.     "Defense Counsel" means the law firms of Kirkland & Ellis LLP and Blank Rome LLP.

O.     "Effective Date" means the date occurring thirty-five (35) days after the last to occur of: (i) the expiration of the time period for an appeal as of right from the Final Approval, if no appeal has been filed; and (ii) the affirmance of Final Approval, or dismissal or withdrawal of all appeals filed from the Final Approval, and the expiration of the time for filing or the denial of all petitions for writs of certiorari or, if certiorari is granted, the date of affirmance of the Final Approval.

P.     "Fairness Hearing" means the hearing to be conducted by the Court to finally determine the fairness, adequacy, and reasonableness of this Agreement.

Q.     "Fee Award" means any award of fees and costs sought by the application to and approved by the Court that is payable to Class Counsel, as described in Paragraphs 34 through 39 of this Agreement.

8

R.     "Final Approval" means the Court's entry of an Order and Final Judgment following the Fairness Hearing finally certifying the class of Settlement Class Members, finally approving this Agreement, and permanently enjoining the commencement or continued prosecution by any Releasing Party of any Released Claim against Sylvania;

S.     "Gross Settlement Fund" means the Cash Settlement Amount and any interest earned thereon.

T.     "Incentive Award" means any award sought by application to and approved by the Court that is payable to any Class Representative from the Gross Settlement Fund.

U.     "Net Settlement Fund" means the Gross Settlement Fund, less Claims Administration Expenses, Notice Expenses, any Fee Award, reimbursement of expenses, any Incentive Award, taxes on interest earned by the Cash Settlement Amount, and tax expenses.

V.     "Notice Expenses" includes all reasonable costs and expenses expended in publishing the Class Notice and providing notice to the appropriate State and Federal officials, including but not limited to: (i) preparing, printing, mailing, disseminating, posting, promoting, internet housing, and publishing of the Class Notice; (ii) obtaining any expert opinions regarding the sufficiency of notice program; and (iii) any other necessary notice or notice-related activities.

W.     "Notice of Missing Information" means the notice sent by the Claims Administrator to a Settlement Class Member who has submitted a Claim Form with incomplete or missing information that is required for the Settlement Class Member to be considered eligible for the class relief provided by this Settlement.

X.     "Objection" is the written communication that a Settlement Class Member may file with the Court in order to object to this Agreement, as provided in Paragraphs 15 through 17 of this Agreement.

Y.     "Objector" is any Settlement Class Member filing an Objection, as provided in Paragraphs 15 through 17 of this Agreement.

Z.     "Order and Final Judgment" means the final order to be entered by the Court approving the Settlement pursuant to the terms and conditions of this Agreement, confirming the certification of the class of Settlement Class Members, dismissing the Action with prejudice, releasing claims, and otherwise directing as the Court or the Settling Parties deem necessary and appropriate to effectuate the terms and conditions of this Agreement.

AA.    "Person" means any individual, corporation, trust, partnership, limited liability company, or other legal entity, and its respective successors or assigns.

BB.    "Plaintiffs' Counsel" has the same meaning as Class Counsel.

CC.    "Preliminary Approval" means the Court's entry of an order approving the timing, content, and manner of Class Notice, conditionally certifying the class of Settlement Class Members, preliminarily approving this Agreement, and enjoining the commencement or continued prosecution by any Releasing Party of any Released Claim against Sylvania.

DD.    "Proof of Purchase" means a receipt, credit card record, document, or product packaging that identifies the purchase of one or more of the Covered Products, or possession of a Covered Product.

EE.    "Related Action" means any action, lawsuit, complaint, or other legal proceeding filed in another state or federal court asserting claims and alleging facts substantially similar to those asserted and alleged in this Action, including but not limited to *Kelly v. Osram Sylvania, Inc.*, No. 0:13-cv-62606-WJZ (S.D. Fla.).

FF.    "Released Claim" means any claim, cross-claim, liability, right, demand, suit, matter, obligation, damages, restitution, disgorgement, loss or cost, attorney's fee or expense, and action or cause of action of any kind and description that any Releasing Party had or has during the Class Period, including assigned claims, whether in arbitration, administrative, or judicial proceedings, whether as individual claims or as claims asserted on a class basis or on behalf of the general public, whether known or unknown, asserted or unasserted, suspected or unsuspected, latent or patent, that is, has been, could reasonably have been, or in the future might reasonably be asserted by any Releasing Party in any action or proceeding in any court or forum, regardless of legal theory or the law under which such action may be brought, and regardless of the type or amount of relief or damages claimed, against Sylvania arising out of or relating to the allegations in the Complaint, Amended Complaint, or Sylvania's marketing, advertising, or packaging for the Covered Products during the Class Period, including but not limited to all claims that were brought or could have been brought in this Action or a Related Action. The Released Claims do not include any claims for personal injury or products liability, though the Parties and their counsel represent that they are not aware of the existence of any such personal injury or products liability claims related to the Covered Products.

GG.   "Releasing Party" means Plaintiffs, each Settlement Class Member, and any Person claiming by or through Plaintiffs or a Settlement Class Member, including as his/her/its spouse, parent, child, heir, guardian, associate, co-owner, attorney, agent, administrator, devisee, predecessor, successor, assignee, representative of any kind, shareholder, partner, director, employee, or affiliate.

HH.   "Request for Exclusion" means the written communication that a Settlement Class Member may submit to the Claims Administrator to be excluded from the Settlement, as provided in Paragraphs 19 through 21.

II.   "Settlement Class" means all persons or entities in the United States and its territories who purchased one or more Covered Products in any U.S. state, territory, or possession at any time during the Class Period, other than for resale or distribution to another person or entity, and who do not timely seek exclusion pursuant to Paragraphs 19 through 21 of this Agreement.   Excluded from the Settlement Class are: Sylvania; Sylvania's current or former employees, officers, and directors; Defense Counsel; any judge presiding over this Action or any Related Action; or any immediate family member of such persons.

JJ.   "Settlement Class Member" means any person falling within the Settlement Class.

KK.   "Settlement Website" means the dedicated website to be administered by the Claims Administrator for purposes of receiving Claim Forms and providing notice and other information regarding this Agreement to Settlement Class Members and others.

LL.   "Sylvania" means OSRAM SYLVANIA, INC. (formerly known as OSRAM SYLVANIA PRODUCTS, Inc., on its own behalf and as successor to the

12

corporation named OSRAM SYLVANIA, INC. which was merged into the surviving corporation, OSRAM SYLVANIA PRODUCTS, INC., before that surviving corporation was renamed OSRAM SYLVANIA, INC.), and any of its present and former parents, predecessors, successors, affiliates, agents, assigns, directors, representatives, employees, divisions, and departments.

### III.   PRELIMINARY APPROVAL

**Motion for Preliminary Approval**

2.      Following execution of this Agreement, Class Counsel shall promptly submit this Agreement to the Court and petition the Court for an order that: (1) appoints Plaintiff to represent the Settlement Class; (2) appoints Class Counsel to represent the Settlement Class; (3) conditionally certifies the Settlement Class under Federal Rule of Civil Procedure 23 for settlement purposes only; (4) appoints Rust Consulting, Inc. as the Claims Administrator; (5) preliminarily approves this Agreement for purposes of issuing Class Notice; (6) approves the timing, content, and manner of Class Notice; (7) enjoins the commencement or continued prosecution of any action, including this Action and any Related Action, by any Releasing Party of any Released Claim against Sylvania; (8) schedules the Fairness Hearing; and (9) makes such orders as are necessary and appropriate to effectuate the terms and conditions of this Agreement.

**Stay of this Action**

3.      Following Preliminary Approval, all activity in the Action shall be stayed, except to the extent necessary to effectuate this Agreement, unless and until this Agreement is terminated pursuant to its terms and conditions.

4.      Upon Preliminary Approval, the commencement or continued prosecution of any Related Action shall be enjoined.

13

**Cooperation**

5.    The Settling Parties shall cooperate in good faith and undertake all reasonable actions and steps to carry out the terms and conditions in this Agreement.

## IV.    NOTICE

**Cost of Notice**

6.    All Notice Expenses shall be paid from the Cash Settlement Amount, as described in Paragraphs 8 through 9 and 29 through 30.

**Notice to State and Federal Officials**

7.    In compliance with the attorney general notification provision of the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1715, within ten (10) days after the motion for Preliminary Approval is filed, Sylvania shall provide or cause to be provided notice of this proposed Settlement to the Attorney General of the United States and to the attorneys general of each state or territory in which a Settlement Class Member resides.  Sylvania shall file with the Court a certification stating the date(s) on which the CAFA notices were sent and shall provide Class Counsel with any substantive responses received in response to any CAFA notice.

**Notice to Settlement Class Members**

8.    Upon Preliminary Approval of this Agreement, Plaintiffs and Class Counsel shall cause the Class Notice to be made as follows:

A.    Direct Notice.  Direct notice will be sent to persons who, in the Claims Administrator's judgment, can be identified as Settlement Class Members in records produced in the Action, at such persons' email or mail address that can be identified in or derived from information in the records produced.

B.    Publication Notice.  The Claims Administrator will cause the Class Notice, in the form approved by the Court in its order of Preliminary Approval, to be

14

published within thirty days (30) days of, but not before, Preliminary Approval in the Action.

C.    Website Notice.    The Claims Administrator shall establish Settlement Websites in English and Spanish for the purposes of disseminating the Class Notice, this Agreement, pleadings, and information relevant to the Settlement, including information relating to filing a claim, opting out of the Settlement, objecting to the Settlement, and deadlines relating to the Settlement.    The Claims Administrator shall establish the Settlement Websites within thirty (30) days of Preliminary Approval in the Action.    The Settlement Websites shall also include an electronic Claim Form to allow on-line submission of claims, as well as a Claim Form that can be downloaded, printed, and mailed to the Claims Administrator.

D.    Notice on Class Counsel's Websites.    Class Counsel shall post on their respective websites a copy of the Class Notice and a link to the Settlement Website.

E.    Toll-Free Telephone Number and Email Address.    The Claims Administrator shall establish and maintain a toll-free number and email address for communication with Class Members.

**Contents of Notice**

9.    The Class Notice shall: (1) advise Settlement Class Members of their rights, including the right to opt-out from or object to this Agreement, and the applicable procedures for doing so; (2) direct Settlement Class Members to the Settlement Website; (3) provide instructions for contacting Class Counsel and the Claims Administrator to obtain a paper Claim Form or otherwise; (4) advise Settlement Class Members that objections to the Agreement and papers submitted in support of such objections shall only be considered at the Fairness Hearing if they are submitted pursuant to the procedures set forth in Paragraphs 15 through 17 of this

15

Agreement; (5) advise Settlement Class Members that the time and place of the Fairness Hearing may change and will be posted on the Settlement Website; and (6) contain any other information agreed to by the Settling Parties.   The Class Notice and related settlement papers, including the Claim Form, shall be available on the website in Spanish.

## V.     ELIGIBILITY FOR RELIEF

10.     To be eligible to receive the relief identified in Paragraph 31, Settlement Class Members must be either (a)  identified in records produced in the Action for the Class Period; or (b)  submit a claim to the Claims Administrator by *either*: (i)  completing, certifying, and mailing the Claim Form included with the Class Notice to the Claims Administrator; or (ii) electronically completing, certifying, and emailing the Claim Form on the Settlement Website to the Claims Administrator.

11.     The Claim Form must be postmarked or submitted electronically no later than the last day of the Claims Period.  Claim Forms postmarked or submitted electronically after the end of the applicable Claims Period shall be denied by the Claims Administrator, and the Claims Administrator shall not make any payment on such claims.  The Settling Parties shall take all reasonable steps, and direct the Claims Administrator to take all reasonable steps, to ensure that Claim Forms completed and signed electronically by Settlement Class Members conform to the requirements of the federal Electronic Signatures Act, 15 U.S.C. § 7001, *et seq*.  Copies of late Claim Forms shall be submitted to Class Counsel.  Class Counsel may request consent from Sylvania to have any late Claim Forms deemed timely.  If consent is not provided, Class Counsel may seek Court review upon written letter copied to Sylvania.

### Review of Claims

12.     The Claims Administrator shall review all submitted Claim Forms within a reasonable time to determine each Settlement Class Member's eligibility for relief, and the

16

amount of any such relief. Copies of submitted Claim Forms and a list of those Class Members who can be identified in records produced in the Action for the Class Period shall be provided to Sylvania and to Class Counsel upon request. Settlement Class Members submitting completed Claim Forms shall be entitled to the relief identified in Paragraph 31, unless the Claims Administrator believes, in good faith, that available information shows the person in question does not satisfy eligibility criteria or that material facts identified in the Claim Form is/are fraudulent or materially inaccurate. Within thirty (30) days after the Claims Period ends, the Claims Administrator shall submit a report to Class Counsel regarding all claims made, the proposed disposition thereof, and the basis for rejection of any claims. The Claims Administrator also will notify each Claimant whose Claim is rejected after approval of the rejection by Class Counsel. Class Counsel may request consent from Sylvania to have any denied Claims deemed approved. If consent is not provided, Class Counsel may seek Court review upon written letter copied to Sylvania.

13.    Any Claimant whose claim is rejected may seek reconsideration by contacting the Claims Administrator. Completed Claim Forms that are timely submitted to the Claims Administrator and that the Claims Administrator does not believe to be fraudulent or materially inaccurate shall be deemed Accepted Claim Forms.

**Incomplete Claim Forms**

14.    The Claims Administrator will notify Class Counsel of any incomplete Claim Forms. The Claims Administrator will also notify the Claimant in writing by certified mail of the specific areas or information that are incomplete on the Claim Form. The Claimant shall have fourteen (14) days to provide any missing or incomplete information to the Claims Administrator. If the Claimant does not provide such information within fourteen (14) days, the claim shall be considered rejected and subject to the provisions of Paragraphs 12 and 13.

17

## VI.    OBJECTIONS AND OPT-OUTS

### Objections

15.    Settlement Class Members shall have the right to appear and show cause if they have any reason why the terms of this Agreement should not be granted Final Approval.  Any objection must be in writing and filed with the Court, with copies delivered to Class Counsel and Defense Counsel at the addresses set forth in the Class Notice, no later than thirty (30) days after the Motion for Final Approval is filed.  Settlement Class Members may object either on their own or through an attorney hired at their own expense.

16.    No Settlement Class Member represented by an attorney shall be deemed to have objected to the Agreement unless an objection signed by the Settlement Class Member himself or herself also is filed with the Court and served upon Class Counsel and Defense Counsel at the addresses set forth in the Class Notice at least thirty (30) days after the Motion for Final Approval is filed.

17.    Any objection regarding or related to the Agreement shall contain a caption or title that identifies it as "Objection to Class Settlement in *Chaudhri v. OSRAM SYLVANIA, INC.*, Civil Action No. 2:11-CV-05504" and information sufficient to identify and contact the objecting Settlement Class Member (or his or her attorney, if any), as well as a clear and concise statement of the Settlement Class Member's objection, the legal grounds on which the objection is based, and documents sufficient to establish the basis for his or her standing as a Settlement Class Member, *i.e.*, Proof of Purchase or verification under oath as to their purchase(s) of the Covered Products.  Any objecting Settlement Class Member who wishes to appear at the Fairness Hearing, whether in person or through an attorney, shall file with the Court a notice of his or her intention to appear.  Such notice must be filed at least fourteen (14) days before the

date set for the Fairness Hearing and must include the name, address, and telephone number of the Settlement Class Member and any attorney who will appear on his or her behalf.

**Right to Respond to Objections**

18.   Class Counsel and Sylvania shall have the right to respond to any objection no later than seven (7) days prior to the date set for the Fairness Hearing. The Settling Party so responding shall file a copy of the response with the Court and serve a copy by regular mail, hand delivery, or overnight delivery on the objecting party or his or her counsel, and on Class Counsel or Defense Counsel.

**Opt-Outs**

19.   Any person who would otherwise be a Settlement Class Member who does not wish to participate in this Settlement must write to the Claims Administrator stating an intention to be "excluded" from this Settlement no later than the last day of the Claims Period. The written Request for Exclusion must be sent via first class United States mail to the Claims Administrator at the address set forth in the Class Notice and postmarked no later than the last day of the Claims Period. The Request for Exclusion must be personally signed by the person who wishes to opt out. So-called "mass" or "class" opt-outs shall not be allowed.

20.   Any Settlement Class Member who does not request to be "excluded" from the Settlement has the right to object to the Settlement. Any Settlement Class Member who wishes to object must timely submit an objection pursuant to Paragraphs 15 through 17 of this Agreement. If a person who would otherwise be a Settlement Class Member submits both an objection and a written Request for Exclusion, he or she shall be deemed to have complied with the terms of the opt-out procedure, and shall not be bound by the Agreement, if approved by the Court.

19

21.     Upon Final Approval of the Settlement, any Settlement Class Member who has not timely requested to be "excluded" from the Settlement shall be bound by the terms of the Agreement.

## VII.   SETTLEMENT CONSIDERATION FROM SYLVANIA

### Settlement Fund

22.     Conditioned on the approvals stated below with respect to each payment, Sylvania shall deposit or transfer a total of $30,000,000 (the "Cash Settlement Amount"), and no more, into escrow in an interest-bearing account established by the Claims Administrator and for the benefit of Plaintiffs and the Settlement Class Members, and conditionally for the benefit of and return to Sylvania if this Agreement is terminated, Final Approval is not granted or is reversed or vacated by court order through appeal, review or other judicial proceeding.  Such deposit or transfer shall be made by two payments, which will together total the Cash Settlement Amount and no more, into the escrow account:  (a) the first, a portion of the Cash Settlement Amount in an amount not to exceed $2,650,000, conditioned on and within fourteen (14) days after the entry of an order granting Preliminary Approval of the Settlement and receipt from the Claims Administrator of wire transfer instructions, tax identification number associated with the escrow fund, and physical address of the bank which will hold the interest-bearing escrow account; and (b) the second, in an amount equal to the Cash Settlement Amount less the sum deposited pursuant to this Paragraph 22, subpart (a), conditioned on and within thirty (30) days after the entry of an order granting Final Approval.

23.     The Cash Settlement Amount and any interest or investment returns earned thereon shall be the "Gross Settlement Fund."  Except as provided for in Paragraphs 29 and 30 of this Agreement, prior to the Effective Date, no withdrawal or payment from the Gross Settlement Fund may be made by or to any Person without the prior written consent of Sylvania.

20

24.     Plaintiffs and Settlement Class Members shall look solely to the Cash Settlement Amount as satisfaction of all claims that are released hereunder.  Under no circumstances shall Sylvania be required to pay more than the Cash Settlement Amount pursuant to this Agreement, including for Claims Administration Expenses, Class Notice, and/or any Fee Award or Incentive Award, or any other payment to any party or their attorneys, experts or consultants with respect to any aspect of this Action, each of which shall be paid exclusively from the Cash Settlement Amount.

25.     Plaintiffs and Settlement Class Members acknowledge that, as of the Effective Date, the releases given herein shall become effective immediately by operation of the Order and Final Judgment and shall be permanent, absolute, and unconditional.

26.     If Final Approval is not granted or is reversed or vacated by court order through appeal, review or other judicial proceeding, the total amount of the Gross Settlement Fund, less any Taxes already properly incurred or paid under the provisions of Paragraph 29 and any Claims Administration Expenses already properly paid pursuant to Paragraph 30 of this Agreement, will be paid to Sylvania.

**Packaging Changes**

27.     In addition to contributing the Cash Settlement Amount, Sylvania will implement new packaging for the SilverStar® ULTRA, SilverStar®, and XtraVision® families of automotive lighting, substantially in the form of packaging attached hereto as Exhibit B. Plaintiffs, Class Counsel and Sylvania agree that, (a) while Sylvania has denied and continues to deny Plaintiffs' claims in this case, one of the reasons for Sylvania's decision to change the packaging was in response to and for the settlement of the claims made by Plaintiffs on behalf of the Class in this litigation, (b) in developing the new packaging, Sylvania has taken into consideration the comments of Plaintiffs and Class Counsel, (c) Sylvania's new packaging

21

addresses Plaintiffs' objections and has no materially misleading claims or representations, and (d) the terms of this agreement do not require Sylvania to keep packaging in the forms reflected in Exhibit B for any particular period of time, nor restrict Sylvania's right to make other packaging or marketing changes. Sylvania represents that it will no longer actively market or sell the Cool Blue® product line in the United States after June 30, 2014. Should Sylvania decide thereafter to manufacture and sell the Cool Blue® product line in the United States, Sylvania agrees to make packaging changes consistent with the alterations made to SilverStar® ULTRA, SilverStar®, and XtraVision® packages.

## VIII.  SETTLEMENT ADMINISTRATION

28.    The Claims Administrator shall administer the Settlement subject to the jurisdiction of the Court. The Claims Administrator agrees to be subject to the jurisdiction of the Court with respect to the administration of the Settlement, the distribution of the Gross Settlement Fund pursuant to the terms of this Agreement, and any issues arising from such administration. Sylvania shall have no responsibility or liability for the administration of the Settlement and shall have no liability to the Settlement Class Members in connection with, as a result of, or arising out of such administration.

29.    All taxes on the income or investment gains of the Gross Settlement Fund and expenses and costs incurred in connection with the taxation of the Gross Settlement Fund (including, without limitation, expenses of tax attorneys and accountant) (collectively, "Taxes") shall be paid out of the Gross Settlement Fund, shall be considered to be a cost of administration of the Settlement, and shall be timely paid by the Claims Administrator without prior order from the Court. Sylvania shall have no liability or responsibility for the payment of any Taxes.

30.    After an order granting Preliminary Approval, without further approval from Sylvania or the Court, Class Counsel may direct and the Claims Administrator may be paid at the

In *Exxon*, former Judge Scott found, and Judge Gold ordered, that the *supersedeas* bond should be calculated as the amount of interest that would accrue on settlement funds whose distribution was delayed by the appeal, for the expected one year duration of the appeal. *Exxon R&R* at 21, n. 8; *Exxon*, 2006 WL 1132371 at 19. Judge Gold thus ordered that if the objecting class member chose to appeal he must post a bond of $13,500,000. *Exxon*, 2006 WL 1132371 at 19. This rule makes eminent good sense, and should be applied here.[5]

Here, the appeals can be expected to last at least a year, and will delay distribution of the entire Net Settlement Fund of approximately $280 million to the Settlement Class Members during that time. The Settlement does not permit distributions to Settlement Class Members until after resolution of any appeals. *See* **DE # 1471-1**, ¶ 83 (distributions to take place "[w]ithin 30 days of the Effective Date"), ¶ 22 (defining "Effective Date" as the fifth business day after all appeals have been concluded, including the time for filing a petition for certiorari). Applying former Judge Scott's reasoning, the Objector-Appellants are clearly adverse to the 99.9% of the Settlement Class Members who have accepted the Settlement by not objecting to it. Accordingly, the Objector-Appellants should be required to post *supersedeas* bonds as a condition to pursuing their appeals of this Court's Order and Final Judgment. The Objector-Appellants should be required to post *supersedeas* bonds equal to two years' interest on $280 million, or $616,338.00, in addition to the $5,000 cost bond under Rule 7.

## IV.    CONCLUSION

For the reasons set forth herein, requiring each of the Objector-Appellants to post significant appeal bonds is justified and appropriate. Plaintiffs respectfully request that the Court

---

[5] In *Exxon*, Judge Gold and Judge Scott based the interest calculation on the T-bill rate, and this amount can be calculated precisely at the time of imposition of the bond.

enter an Order under FRAP 7 and 8 requiring each of the Objector-Appellants to post appeal

bonds totaling $621,338.00, and for such other relief as this Court deems appropriate.

Dated:  December 27, 2011.

Repectfully submitted,

/s/ Aaron S. Podhurst
Aaron S. Podhurst, Esquire
Florida Bar No. 063606
apodhurst@podhurst.com
Robert C. Josefsberg, Esquire
Florida Bar No. 40856
rjosefsberg@podhurst.com
Steven C. Marks, Esquire
Florida Bar No.  516414
smarks@podhurst.com
Peter Prieto, Esquire
Florida Bar No. 501492
pprieto@podhurst.com
Stephen F. Rosenthal, Esquire
Florida Bar No. 0131458
srosenthal@podhurst.com
John Gravante, III, Esquire
Florida Bar No. 617113
jgravante@podhurst.com
PODHURST ORSECK, P.A.
City National Bank Building
25 W. Flagler Street, Suite 800
Miami, FL 33130-1780
Tel: 305-358-2800
Fax: 305-358-2382

/s/ Bruce S. Rogow
Bruce S. Rogow, Esquire
Florida Bar No. 067999
brogow@rogowlaw.com
Bruce S. Rogow, P.A.
Broward Financial Center
500 East Broward Boulevard
Suite 1930
Fort Lauderdale, FL  33394
Tel: 954-767-8909
Fax: 954-764-1530

*Co-Lead Counsel for Plaintiffs*

16

/s/ Robert C. Gilbert
Robert C. Gilbert, Esquire
Florida Bar No. 561861
rcg@grossmanroth.com
Stuart Z. Grossman, Esquire
Florida Bar No. 156113
szg@grossmanroth.com
David M. Buckner, Esquire
Florida Bar No. 60550
dbu@grossmanroth.com
Seth E. Miles, Esquire
Florida Bar No. 385530
sem@grossmanroth.com
GROSSMAN ROTH, P.A.
2525 Ponce de Leon Boulevard
Eleventh Floor
Coral Gables, FL 33134
Tel: 305-442-8666
Fax: 305-779-9596

*Coordinating Counsel for Plaintiffs*

/s/ E. Adam Webb
E. Adam Webb, Esquire
Georgia Bar No. 743910
Adam@WebbLLC.com
Matthew C. Klase, Esquire
Georgia Bar No. 141903
Matt@WebbLLC.com
G. Franklin Lemond, Jr., Esquire
Georgia Bar No. 141315
FLemond@WebbLLC.com
WEBB, KLASE & LEMOND, L.L.C.
1900 The Exchange, S.E.
Suite 480
Atlanta, GA 30339
Tel: 770-444-9325
Fax: 770-444-0271

/s/ Michael W. Sobol
Michael W. Sobol, Esquire
California Bar No. 194857
msobol@lchb.com
Roger N. Heller, Esquire
California Bar No. 215348
rheller@lchb.com
Jordan Elias, Esquire
California Bar No. 228731
jelias@lchb.com
LIEFF CABRASER HEIMANN &
   BERNSTEIN L.L.P.
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
Tel: 415-956-1000
Fax: 415-956-1008

/s/ Russell W. Budd
Russell W. Budd, Esquire
Texas Bar No. 03312400
rbudd@baronbudd.com
Bruce W. Steckler, Esquire
Texas Bar No. 00785039
bsteckler@baronbudd.com
Mazin A. Sbaiti, Esquire
Texas Bar No. 24058096
msbaiti@baronbudd.com
BARON & BUDD, P.C.
3102 Oak Lawn Avenue
Suite 1100
Dallas, TX 75219
Tel: 214-521-3605
Fax: 214-520-1181

/s/ David S. Stellings
David S. Stellings, Esquire
New York Bar No. 2635282
dstellings@lchb.com
LIEFF CABRASER HEIMANN &
  BERNSTEIN L.L.P.
250 Hudson Street
8th Floor
New York, NY 10013
Tel: 212-355-9500
Fax: 212-355-9592

/s/ Ruben Honik
Ruben Honik, Esquire
Pennsylvania Bar No. 33109
rhonik@golombhonik.com
Kenneth J. Grunfeld, Esquire
Pennsylvania Bar No. 84121
kgrunfeld@golombhonik.com
GOLOMB & HONIK, P.C.
1515 Market Street
Suite 1100
Philadelphia, PA 19102
Tel: 215-985-9177
Fax: 215-985-4169

/s/ Ted E. Trief
Ted E. Trief, Esquire
New York Bar No. 1476662
ttrief@triefandolk.com
Barbara E. Olk, Esquire
New York Bar No. 1459643
bolk@triefandolk.com
TRIEF & OLK
150 E. 58th Street
34th Floor
New York, NY 10155
Tel: 212-486-6060
Fax: 212-317-2946

*Plaintiffs' Executive Committee*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 09-MD-02036-JLK

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

**CERTIFICATE OF SERVICE**

I hereby certify that on December 27, 2011, I electronically filed the foregoing document

with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being

served this day on all counsel of record or *pro se* parties identified on the attached Service List in

the manner specified, either via transmission of Notices of Electronic Filing generated by

CM/ECF or in some other authorized manner for those counsel or parties who are not authorized

to receive electronically Notices of Electronic Filing.

/s/ Robert C. Gilbert
Robert C. Gilbert, Esquire
Florida Bar No. 561861
GROSSMAN ROTH, P.A.
2525 Ponce de Leon Boulevard
Eleventh Floor
Coral Gables, FL 33134
Tel: 305-442-8666
Fax: 305-779-9596

19

commencement of each month prior to Final Approval the reasonable costs and expenses expected to be incurred by the Claims Administrator in that month for Claims Administration Expenses (including, without limitation, the costs of Notice, the establishment and operation of the Settlement Website, and other reasonable expenses or fees charged by the Claims Administrator in connection with providing notice and processing submitted claims), up to a total of no more than the amount provided in Paragraph 22, subparagraph (a). Any such payment to the Claims Administrator shall not affect the amount of the Cash Settlement Amount, or the time by which Sylvania is required to deposit any portion of the Cash Settlement Amount pursuant to Paragraph 22.

## IX.   DISTRIBUTION TO AUTHORIZED CLAIMANTS

31.   For each Claimant determined by the Claims Administrator to be eligible pursuant to the provisions of Paragraphs 10 through 14, the Claims Administrator shall make a pro-rata payment to that Claimant out of the Net Settlement Amount. Each Claimant determined to be eligible shall be entitled to payment from the Net Settlement Amount for one claimed purchase of the Covered Products, regardless of how many additional products the Claimant may claim to have purchased.

32.   Payments to Claimants shall be made by check and mailed to the Claimants following, but no later than ninety (90) days after, the Effective Date. All checks will indicate on their face that they are void if not negotiated within one hundred twenty days (120) days of issuance. Funds from the checks returned as undeliverable or remaining uncashed for more than one hundred twenty days (120) days after issuance shall be redeposited into the Net Settlement Fund.

33.   If all eligible Claims have been paid and funds remain in the Net Settlement Fund two-hundred and seventy (270) days after the Effective Date, subject to an application to be filed

23

by Class Counsel to the Court and the Court's approval thereof, distribution of any remaining funds will be made to eligible Claimants who cashed their initial checks on a pro-rata basis, provided, however that if the costs of administration for making such a distribution would constitute a material part of the remaining funds, then those remaining funds shall be distributed as directed by the Court. Subject to the terms of this Agreement, the Settling Parties intend to distribute all remaining money in the Net Settlement Fund to eligible Claimants.

## X.   FEE AND INCENTIVE AWARDS

34.   Under no circumstances shall any Fee Award or Incentive Award described herein, or any other claim to compensation from any party or their attorneys, experts or consultants, constitute an obligation for Sylvania to contribute any more than the Cash Settlement Amount. None of the provisions of this Agreement is conditioned on the Court's approval of, or on the amount of, any Fee Award or Incentive Award or other compensation for any party or their attorneys, experts or consultants.

**Fee Award**

35.   Class Counsel may apply on behalf of Class Counsel to the Court for a Fee Award from the Gross Settlement Fund of attorneys' fees and reimbursement of expenses as consideration for obtaining the Settlement as described herein.

36.   Class Counsel has not sought Sylvania's consent to any Fee Award, and Sylvania takes no position with respect to any Fee Award that may be approved by the Court for payment from the Gross Settlement Fund after the Effective Date.

**Application and Payment of Fee Award**

37.   Class Counsel's final application for any Fee Award, and any documents submitted in support thereof, shall be filed with the Motion for Final Approval. Any Fee Award

24

approved by the Court shall be paid from the Gross Settlement Fund not prior to, but within ten (10) business days following, the Effective Date.

38.    Any Fee Award shall be wired by the Claims Administrator to an account established by Class Counsel for distribution to Class Counsel. Sylvania shall bear no responsibility or liability for the apportionment and distribution of fees to, between, or among Class Counsel or any other person.

39.    Notwithstanding any other provision of this Agreement to the contrary, the procedure for the allowance (in whole or in part) by the Court of any application by Class Counsel for attorney's fees, costs, and expenses, to be paid as the Fee Award, are to be considered by the Court separately and apart from its consideration of the fairness, reasonableness, and adequacy of the Settlement, provided, however, that the provisions of this Agreement that provide that under no circumstances shall Sylvania be obligated to contribute any more than the $30,000,000 Cash Settlement Amount, as set forth herein, are an integral and indispensable condition of Sylvania's agreement.

**Incentive Award to Class Representatives**

40.    Subject to approval by the Court and in recognition of Class Representatives' time and effort expended on behalf of the Settlement Class Members, Class Representatives may seek incentive awards in the aggregate amount of up to twenty-five thousand dollars ($25,000.00), to be paid from the Gross Settlement Fund not prior to, but within ten (10) business days following, the Effective Date.

41.    Each of the Settling Parties and their counsel represent and warrant that they have made no agreement with or promise for Plaintiffs, any Class Representative, or any other Settlement Class Member to receive any payments or value in respect of this case or this Settlement, other than to participate as a Settlement Class Member in the claims and distribution

25

provisions of this Agreement and to receive, subject to the approval of the Court, an Incentive Award as described in Paragraph 40.

## XI.  FINAL APPROVAL

### Motion for Final Approval

42.     No later than twenty-one (21) days after receiving the Claims Administrator's report pursuant to Paragraph 12, Class Counsel shall petition the Court for a final order that: (1) confirms the certification of the class of Settlement Class Members, as defined above; (2) dismisses the Action, with prejudice, upon the Effective Date; (3) decrees that neither the Final Approval nor this Agreement constitutes an admission of liability, fault, or wrongdoing; (4) enjoins all Releasing Parties and Related Actions from asserting and Released Claims against Sylvania; (5) releases Sylvania from the Released Claims of all Releasing Parties; (6) finds that this Agreement is entered into in good faith, is reasonable, fair, and adequate, and is in the best interest of the Settlement Class Members; (7) preserves the Court's continuing and exclusive jurisdiction over the Settling Parties, including Sylvania and all Settlement Class Members, to administer, supervise, construe, and enforce this Agreement in accordance with its terms and conditions, but without affecting the finality of the Final Approval; and (8) making such orders necessary and appropriate to effectuate the terms and conditions of this Agreement.

### Fairness Hearing

43.     Subject to the Court's schedule, the parties agree that within seventy-five (75) days after the Motions for Final Approval and Attorneys' Fees, Costs and Incentive Awards are filed, the Court should conduct a Fairness Hearing so that the Court may review any objections to this Agreement, consider the fairness, reasonableness, and adequacy of this agreement, consider Class Counsel's petition for a Fee Award, and consider Class Counsel's petition for Final Approval.  The date of the Fairness Hearing shall be posted on the Settlement Website in

26

advance of the hearing.  If the date of the Fairness Hearing is subsequently modified by the Court, no further notice is required to be published to Settlement Class Members, except that the Parties will notify any Objector in writing of any modifications to the date of the Fairness Hearing.

### Dismissal of this Action

44.    The Final Approval shall provide that this Action shall be dismissed, with prejudice, upon the Effective Date.

### Dismissal of Related Actions

45.    Following Final Approval, Class Counsel shall cooperate with and assist Sylvania in seeking the dismissal, with prejudice, of any Related Actions.

### Cooperation

46.    The Settling Parties shall cooperate in good faith and undertake all reasonable actions and steps to accomplish the events described in this Agreement, including in obtaining Preliminary Approval and Final Approval, to respond to any collateral attack on the Settlement, this Agreement, and/or its preclusive effect, and to take any appeal from an order denying Final Approval.  Notwithstanding the foregoing, however, Sylvania shall have no obligation to take any position regarding amounts awarded or not awarded to Class Counsel as part of any Fee Award, or to amounts awarded or not awarded to Plaintiffs as part of any Incentive Award.

## XII.   TERMINATION

### Right to Terminate

47.    This Agreement is contingent upon the final certification of the Settlement Class, Final Approval, and the Agreement becoming Final.  Sylvania may terminate this Agreement in its entirety at any time and without further obligation if: (1) any court rejects or denies approval or any term or condition of this Agreement; (2) any court makes any order purporting to alter,

27

amend, or modify any term or condition of this Agreement; (3) any court fails to certify the Settlement Class; (4) any court makes any order purporting to preclude Plaintiffs and/or Sylvania from proceeding in whole or in part with any of the terms and conditions of this Agreement; or (5) more than an agreed upon number of Class Members timely and validly opt out of the Settlement, in accordance with the terms and conditions set forth in Paragraphs 19 through 21 of this Agreement.

### Notice of Termination

48.    If Sylvania exercises its right to terminate this Agreement, Sylvania shall promptly notify the Court and Class Counsel in writing and direct the Claims Administrator to notify the Settlement Class Members by: (i) posting information on the Settlement Website; and (ii) emailing information to those Claimants who provided an email address to the Claims Administrator.

### Effect of Termination

49.    If Sylvania exercises its right to terminate this Agreement, this Agreement shall be considered null and void, with no further force or effect, no Person shall be bound by any of its terms or conditions (except with regard to return of any remaining portions of the Cash Settlement Amount with any interest or investment returns thereon), and the rights of any Person with respect to the claims and defenses asserted in this Action shall be restored to the positions existing immediately prior to the execution of this Agreement.

50.    Except as otherwise expressly provided herein, if the Agreement is terminated in accordance with its terms and conditions, vacated, or otherwise fails to become effective for any reason, the Settling Parties shall be deemed to have reverted to their respective statuses in the Action as of the date of this Agreement.  In that event, except as otherwise expressly provided, the Settling Parties shall proceed in all respects as if this Agreement and any related orders had

28

not been entered, and any portion of the Cash Settlement Amount previously paid by or on behalf of Sylvania, together with any interest or investment returns earned thereon, less any Taxes due with respect to such income or returns and any costs from the Claims Administrator for administration and notice actually incurred and paid or payable from the Cash Settlement Amount, shall be returned to Sylvania.

## XIII.   RELEASE

### Release

51.      Upon Final Approval, and notwithstanding the provisions of Section 1542 of the Civil Code of the State of California and any similar, comparable, or equivalent provision of any other state law, each Settlement Class Member who has not validly and timely opted out of the Settlement shall be deemed to irrevocably and unconditionally release and discharge Sylvania of and from liability for any and all Released Claims, and shall be permanently barred and enjoined from initiating, asserting, and/or prosecuting any Released Claims against Sylvania in any court or forum.  This Agreement shall be the sole and exclusive remedy for any and all Released Claims against Sylvania.  Sylvania shall not be subject to liability or expense of any kind to any Releasing Party with respect to any Released Claim.

### Binding Effect

52.      The Settling Parties agree that they may hereafter discover facts in addition to or different from those they believe to be true regarding the subject matter of this Agreement.  The Settling Parties agree that, notwithstanding the discovery of any such additional or different facts that, if known, could materially affect their decisions to enter into this Agreement, the provisions of this Agreement, including releases given herein, shall be and remain in effect as a full, final, and complete general release of the Released Claims, and the Settling Parties shall not be entitled to modify or set aside this Agreement, in whole or in part, by reason thereof.  With respect to any

29

and all Released Claims, upon the Effective Date, the Settling Parties hereby expressly waive and relinquish any and all rights and benefits conferred by any law of any state or territory of the United States, or principle of common law, which might otherwise render unenforceable a release contained in this Agreement, including but not limited to Section 1542 of the Civil Code of the State of California (or any law or principle of common law which is similar, comparable, or equivalent to Section 1542 of the Civil Code of the State of California), which provides:

> **"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."**

## XIV.   SETTLEMENT PURPOSES ONLY

### No Admission

53.    This Agreement, whether or not consummated, and any communications exchanged or actions taken pursuant to or during the negotiation of this Agreement are for settlement purposes only.  Neither the fact of nor the contents of this Agreement or its exhibits, nor any communications exchanged nor actions taken pursuant to or during the negotiation of this Agreement, shall constitute, be construed as, or be admissible in evidence as an admission of the validity of any claim asserted or fact alleged in this Action or any Related Action, or of any wrongdoing, fault, violation of law, or liability of any kind by Sylvania.

### Inadmissibility

54.    This Agreement and all negotiations, correspondence, and communications leading up to its execution shall be deemed to be protected by Federal Rule of Evidence 408 and any analogous state or federal rules or principles.  Neither this Agreement nor any terms, conditions, contents, provisions, or exhibits hereof, nor any negotiations, correspondence, or communications leading up to the execution of this Agreement, shall constitute a precedent or be

discoverable or admissible for any purpose in any proceedings; provided, however, that this Agreement shall be admissible in any proceeding related to the approval of this Agreement, to enforce any of its terms and conditions, to support or defend this Agreement in an appeal from an order granting or denying Final Approval, or to enforce or assert a claim or defense of res judicata, collateral estoppel, claim preclusion, issue preclusion, settlement, release, merger and bar, or any similar claim or defense against Plaintiffs, any Settlement Class Member, or any third party.

### Reservation of Rights

55.   This Agreement is made without prejudice to Sylvania's rights to: (1) oppose class certification in this Action, or any Related Action, if this Agreement is terminated or if Final Approval is not granted or is reversed or vacated after appeal or other judicial proceeding; or (2) oppose class certification in any Related Action or other putative or certified class action, should those actions not be dismissed.

## XV.   ADDITIONAL REPRESENTATIONS AND WARRANTIES

### Authority to Execute

56.   The signatories to this Agreement represent and warrant that they are fully empowered and authorized by the Settling Parties who they respectively represent to enter into this Agreement and bind the Settling Parties to the terms and conditions hereof.

57.   The Settling Parties represent and warrant that the signatories to this Agreement are fully empowered and authorized by the Settling Parties to enter into this Agreement and bind the Settling Parties to the terms and conditions hereof.

31

### Assignment of Claims

58.     The Settling Parties represent and warrant that no claim and no portion of any claim referenced or released in this Agreement has been sold, assigned, conveyed, or otherwise transferred to any other Person.

### Reading and Understanding, Receipt of Advice of Counsel

59.     The Settling Parties acknowledge, agree, and specifically represent and warrant that they have carefully and fully read and understand this Agreement, including all terms and conditions and all exhibits attached hereto; that they have received independent legal advice regarding the advisability of entering into this Agreement and the legal effects of this Agreement, including the Release provisions in Paragraphs 51 through 52.

### Reliance on Own Judgment

60.     The Settling Parties acknowledge, agree, and specifically represent and warrant that they have relied upon their own judgment and that of their legal counsel regarding the sufficient and agreed-upon consideration for this Agreement, and that no statement outside of this Agreement by any of the other Settling Parties or their agents, employees, directors, or legal representatives influenced or induced them to execute this Agreement.

## XVI.  INTERPRETATION AND ENFORCEMENT

### Governing Law

61.     This Agreement shall be construed under and governed by the laws of the State of New Jersey, applied without regard to laws applicable to choice of law.

### Entire Agreement

62.     This Agreement, including all exhibits hereto, shall constitute the entire Agreement among the Settling Parties with regard to the subject of this Agreement and shall

32

supersede any previous agreements, representations, communications, and understandings among the Settling Parties with regard to the subject matter of this Agreement.

**Joint Preparation**

63.     This Agreement shall be construed as if the Settling Parties jointly prepared it in all respects, and any uncertainty or ambiguity shall not be interpreted against the interests of any of the Settling Parties based on that party's involvement in preparing any language herein.

**Captions**

64.     The captions and section headings used in this Agreement are for convenience and identification purposes only and are not part of this Agreement.

**Modification**

65.     This Agreement may not be changed, modified, or amended, except in writing signed by all Settling Parties and approved by the Court.   Notwithstanding the foregoing, however, the Settling Parties may, without Court approval, mutually agree to reasonable extensions of time in which to accomplish the tasks required by the terms and conditions of this Agreement or waive immaterial non-compliance with the claims and distribution process described herein.

**Waiver**

66.     The waiver on any one occasion of any term, condition, or breach of this Agreement shall not be deemed to be a waiver of any other term, condition, or breach of this Agreement, and shall not be deemed to be a continuing waiver or evidence of waiver on any other occasion.

### Binding Effect

67.     This Agreement shall be binding upon and inure to the benefit of the Settling

Parties and each of their respective heirs, successors, assigns, executors, and legal

representatives.

### Continuing Jurisdiction

68.     The Settling Parties agree that the Court shall retain exclusive and continuing

jurisdiction of the Action, Settling Parties, Settlement Class Members, and the Claims

Administrator to interpret and enforce the terms, conditions, and obligations of this Agreement.

## XVII. MISCELLANEOUS TERMS AND CONDITIONS

### Litigation Brought in Good Faith

69.     The Settling Parties to this Agreement intend the Settlement to be a final and

complete resolution of all disputes that have been or could be asserted by the Settlement Class

Members against Sylvania with respect to the Settled Claims.  Accordingly, the Settling Parties

and Class Counsel agree not to assert in any forum that the litigation was brought by Plaintiffs or

defended by Sylvania in bad faith or without a reasonable basis, or to assert any violation of Rule

11 of the Federal Rules of Civil Procedure or of 28 U.S.C. § 1927 relating to the prosecution,

defense, or settlement of this Action.

70.     The Settling Parties agree that the amount paid and the other terms of this

Agreement were negotiated in good faith at arm's-length by the Settling Parties, with the

assistance of mediators, and reflect a Settlement that was reached voluntarily after consultation

with experienced legal counsel.

**Time Calculation**

71.     Except as otherwise provided in this Agreement, all time periods set forth herein shall be computed pursuant to the rules and procedures set forth in Rule 6(a) of the Federal Rules of Civil Procedure.

**No Conflict Intended**

72.     Any inconsistency between this Agreement and any exhibits hereto shall be resolved in favor of this Agreement.   Any inconsistency between the headings used in this Agreement and the text in the paragraphs of this Agreement shall be resolved in favor of the text in the paragraphs.

**Notices**

73.     Any notice, instruction, application for Court approval, or application for Court orders sought in connection with this Agreement, or any document to be given by any Settling Party to any other Settling Party shall be in writing and delivered personally or sent by registered or certified mail, postage prepaid, to Class Counsel at the following addresses:

John E. Keefe, Jr., Esq.
KEEFE BARTELS
170 Monmouth Street
Red Bank, NJ  07701

Barry R. Eichen, Esq.
EICHEN CRUTCHLOW ZASLOW & McELROY, LLP
40 Ethel Road
Edison, NJ  08817

and to Sylvania's counsel at the following addresses:

Brant W. Bishop, P.C.
Eunnice H. Eun
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005

35

Stephen M. Orlofsky
David C. Kistler
New Jersey Resident Partners
BLANK ROME LLP
301 Carnegie Center, 3d Floor
Princeton, NJ 08540

**Execution**

74.    This Agreement may be executed by facsimile or email signatures in multiple

counterparts, each of which shall be deemed an original and all of which, when taken together,

shall constitute one and the same valid and binding agreement.

**Publicity**

75.    Prior to the date that this Agreement is filed with the Court, neither the Settling

Parties nor any of their respective counsel shall initiate any communication regarding the

Settlement or this Agreement with the media or other third-parties not presently involved in this

Action.   In the event that any representative of the media initiates an inquiry regarding the

Settlement or this Agreement prior to the date that the Agreement is filed with the Court, the

Settling Parties and their respective counsel agree to respond, if at all, by referring the media to

publicly-filed documents in this Action.

36

**IN WITNESS WHEREOF,** each of the Settling Parties hereto has caused this Agreement to be executed on its behalf by its duly authorized counsel of record, all as of the day set forth below.

John E. Keefe, Jr., Esq.
KEEFE BARTELS
170 Monmouth Street
Red Bank, NJ 07701
Telephone: (732) 224-9400

Brant W. Bishop, P.C. (*pro hac vice*)
Eunnice H. Eun (*pro hac vice*)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Phone: (202) 879-5000

Barry R. Eichen, Esq.
EICHEN CRUTCHLOW ZASLOW &
McElroy, LLP
40 Ethel Road
Edison, NJ 08817
Telephone: (732) 777-0100

Stephen M. Orlofsky
David C. Kistler
New Jersey Resident Partners
BLANK ROME LLP
301 Carnegie Center, 3rd Floor
Princeton, NJ 08540
Telephone: (609) 750-7700

*Co-Lead Counsel on behalf of all Plaintiffs and
Class Representatives:*
*Imran Chaudhri*
*Lee Kelly*
*Derek Hahn*
*David Christopher*
*Larry Byrd*
*Richard Smith*
*Deidra Ross*

*Counsel on behalf of Defendants
OSRAM SYLVANIA, Inc. and
OSRAM SYLVANIA PRODUCTS, Inc.*

37

**IN WITNESS WHEREOF,** each of the Settling Parties hereto has caused this Agreement to be

executed on its behalf by its duly authorized counsel of record, all as of the day set forth below.


John E. Keefe, Jr., Esq.
KEEFE BARTELS
170 Monmouth Street
Red Bank, NJ 07701
Telephone: (732) 224-9400

Barry R. Eichen, Esq.
EICHEN CRUTCHLOW ZASLOW &
McElroy, LLP
40 Ethel Road
Edison, NJ 08817
Telephone: (732) 777-0100

*Co-Lead Counsel on behalf of all Plaintiffs and
Class Representatives:*
*Imran Chaudhri*
*Lee Kelly*
*Derek Hahn*
*David Christopher*
*Larry Byrd*
*Richard Smith*
*Deidra Ross*

Brant W. Bishop, P.C. (*pro hac vice*)
Eunnice H. Bun (*pro hac vice*)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Phone: (202) 879-5000

Stephen M. Orlofsky
David C. Kristler
New Jersey Resident Partners
BLANK ROME LLP
301 Carnegie Center, 3rd Floor
Princeton, NJ 08540
Telephone: (609) 750-7700

*Counsel on behalf of Defendants*
*OSRAM SYLVANIA, Inc. and*
*OSRAM SYLVANIA PRODUCTS, Inc.*

37

# Exhibit "C"

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IMRAN CHAUDHRI, individually,<br>And on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>    - against-<br><br>OSRAM SYLVANIA, INC., and OSRAM<br>SYLVANIA PRODUCTS, INC.,<br><br>        Defendants. | Civil Action No.<br>2:11-CV-05504-SDW-MCA<br><br>**CERTIFICATION OF NORMAN SWETT** |

I, Norman Swett, of full age, certify:

1.      I am a Senior Project Manager for Rust Consulting, Inc.  ("Rust Consulting"), the Settlement Administrator in this case.  I am over twenty-one years of age and am authorized to make this certification on behalf of Rust Consulting and myself.

2.      Rust Consulting has extensive experience in class action matters, having provided services in class action lawsuits affecting millions of class members in cases involving employment, consumers, property, insurance, securities and product liability, among its more than 3,500 projects.

3.      The Court appointed Rust Consulting as the settlement administrator for this Settlement.

4.      Except as otherwise stated, I am fully familiar with and have personal knowledge of the matters in this Certification and am competent to testify about them if called upon to do so.

5.      A twelve-month delay in distribution of the Settlement Fund will result in additional expenses to administering the Settlement.  The estimated cost for one year is $75,882.

1    The added expenses include (1) costs related to claimants' or class members' communications;

2    and (2) costs of technical and project support, including maintaining the settlement website, toll-

3    free telephone number and data storage.  Exhibit "A" lists the estimated additional expenses.

4
5           I certify that the statements made by me are true and accurate to the best of my knowledge

6    and belief.   I understand that, if any of these statements are willfully false, I am subject to

7    punishment.

8    Dated: 4/24/2015

9                                                    _____
                                                      NORMAN SWETT
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "A"

**Chaudhri v Osram Sylvania Projected Expenses During Appeal**
**April 24, 2015**

| Description | Volume | | Rate($) | | Total ($) | Frequency |
|---|---|---|---|---|---|---|
| **Legal Notification** | | | | | | |
| *Follow-Up to Initial Notice* | | | | | | |
| Receive Undeliverable Mail and Update Database | 100 | Notices | $ | 0.35 | $ 35 | Monthly |
| | | | | | | |
| **Website (English and Spanish)** | | | | | | |
| Draft and post website content | 4 | Hours | $ | 155.00 | $ 620 | One-Time Fee |
| Spanish Translation | 2 | One-Time Fee | $ | 500.00 | $ 1,000 | One-Time Fee |
| Monthly Maintenance/Hosting | 1 | Month | $ | 300.00 | $ 300 | Monthly |
| | | | | | | |
| **Claims Processing** | | | | | | |
| **Correspondence** | | | | | | |
| Receipt (email and white mail) | 5 | Pieces | $ | 0.75 | $ 4 | Monthly |
| Process | 0.75 | Hours | $ | 100.00 | $ 75 | Monthly |
| | | | | | | |
| **Hard Copy Claim Forms** | | | | | | |
| Receipt | 2 | Claims | $ | 0.75 | $ 2 | Monthly |
| Data Capture | 2 | Claims | $ | 1.00 | $ 2 | Monthly |
| Imaging (2 Pages per Form) | 4 | Pages | $ | 0.12 | $ 0 | Monthly |
| | | | | | | |
| **Full Automated Call Center (minimum $500/month)** | | | | | | |
| Spanish Translation and Recording | 2 | One-Time Fee | $ | 500.00 | $ 1,000 | One-Time Fee |
| Draft Scripting, Coordination, Recording and Reports | 4 | Hours | $ | 155.00 | $ 620 | One-Time Fee |
| Interactive Voice Response (Automated Q&A) | 523 | Minutes | $ | 0.49 | $ 256 | Monthly |
| 800# Charges | 504 | Minutes | $ | 0.12 | $ 60 | Monthly |
| | | | | | | |
| **Distribution and Tax Reporting** | | | | | | |
| **Fund Distribution** | | | | | | |
| Address Trace | 25 | Pieces | $ | 0.20 | $ 5 | Monthly |
| | | | | | | |
| **Fees** | | | | | | |
| Project Management | 10 | Hours | $ | 155.00 | $ 1,550 | Monthly |
| Technical Consulting | 4 | Hours | $ | 170.00 | $ 680 | Monthly |
| | | | | | | |
| **Expenses** | | | | | | |
| Storage | 100 | Boxes | $ | 2.50 | $ 250 | Monthly |
| Data Storage | 1 | Monthly | $ | 3,200.00 | $ 1,850 | Monthly |
| P.O Box Renewal | 2 | Yearly | $ | 1,218.00 | $ 2,436 | Annual |
| Tax Reporting | 1 | Yearly | $ | 1,750.00 | $ 1,750 | Annual |
| Taxes | 1 | Yearly | $ | 500.00 | $ 500 | Annual |
| Printing/Photocopies | 100 | print outs | $ | 0.14 | $ 14 | Monthly |
| IVR System Charge | 1 | | $ | 280.00 | $ 280 | Monthly |
| Miscellaneous | 1 | | $ | 300.00 | $ 300 | Monthly |

| Projected Expenses | |
|---|---|
| Total One-Time Expenses | $ 3,240 |
| Total Annual Expenses | $ 4,686 |
| Total Monthly Expenses | $ 5,663 |

| One Year Projected Expenses | |
|---|---|
| 1 x Total One-Time Expenses | $ 3,240 |
| 1 x Total Annual Expenses | $ 4,686 |
| 12 Months x Monthly Expenses | $ 67,956 |
| Total Projected One-Year Expenses | $ 75,882 |

# Exhibit "D"

John E. Keefe, Jr.
Keefe Bartels, LLC
170 Monmouth Street
Red Bank, New Jersey 07701
(732) 224-9400

Barry R. Eichen, Esq.
EICHEN CRUTCHLOW ZASLOW &
McELROY, LLP
40 Ethel Road
Edison, New Jersey 08817
(732) 777-0100
*Class Counsel for the Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IMRAN CHAUDHRI, DEIDRA ROSS, RICHARD SMITH, LARRY BYRD, DAVID CHRISTOPHER, DEREK HAHN and LEE S. KELLY, individually, and on behalf of themselves and all others similarly situated, | Case No. 2:11-CV-05504 (SDW)(MCA) |
| Plaintiffs, | |
| v. | **CERTIFICATION OF** |
| | **CHRISTOPHER G. LINSCOTT** |
| OSRAM SYLVANIA, INC., and OSRAM SYLVANIA PRODUCTS, INC., | |
| Defendants. | |

I, CHRISTOPHER G. LINSCOTT, of full age, hereby certify as follows:

1.       I am a Director of Keegan, Linscott & Kenon, P.C. and Director of the firm's Litigation Support, Bankruptcy and Forensic Accounting Practice, and have been qualified as an economic expert and prepared written and oral testimony before various courts.  Attached as Exhibit "A" is my *curriculum vitae*.

2.       The statements made by me in this Certification are based upon my experience, personal knowledge and applicable financial rates.

3.    Attached as Exhibit "B" is an analysis of the lost interest for the Settlement Fund's Principal of $27,350,000 for one year.

4.    The interest rate is based upon the 20-year treasury rate released on April 21, 2015.  The treasury rate represents a conservative rate of return on the Principal.

5.    As shown in Exhibit "A," the Potential Lost Interest after year one is $636,871.

I certify that the statements made by me are true and accurate to the best of my knowledge and belief.  I understand that, if any of these statements are willfully false, I am subject to punishment.

Dated:  April 25, 2015

CHRISTOPHER G. LINSCOTT

# Exhibit "A"

**CHRISTOPHER G. LINSCOTT**
**33 N. STONE AVENUE, SUITE 1100**
**TUCSON, ARIZONA 85701**
**(520) 884-0176**

**EDUCATION:**

B.A. Psychology, Amherst College, 1980
M.S. Accounting, New York University GBA, 1982
Certified Public Accountant (CPA) 1984
Certified Fraud Examiner (CFE) 1992
Certified Insolvency and Restructuring Advisor (CIRA) 1997

**BACKGROUND:**

1994 - Present
**DIRECTOR**
**Keegan, Linscott & Kenon, P.C.**
**DIRECTOR**
**The KLK Consulting Group, Inc.**

Owner of CPA firm. Head of litigation support, bankruptcy and forensic accounting practice for the firm. Other duties include managing corporate financial audits and tax clients.

1990-1993
**DIRECTOR, LITIGATION SUPPORT SERVICES**
**Coopers & Lybrand -- Tucson, AZ**

Responsible for work associated with accounting support for attorneys involved in litigation, fraud, receivership cases and bankruptcy work in Southern Arizona. Primary litigation duties included damage calculation review and preparation, forensic accounting and financial analysis. Other duties included manager responsibilities for financial audits.

1989-1990
**CHIEF FINANCIAL OFFICER**
**Tombstone & Southern Railroad, Inc.**

Served for two years as CFO of start-up entertainment projects in Cochise County.  As one of three principals in this project, duties encompassed finance; budgeting, taxes, financial reporting, prospective reporting, capital solicitation, cash management and development of a business plan. Non-financial responsibilities included marketing, public speaking and recruitment of personnel.

1981-1989
**SENIOR AUDIT MANAGER**
**Peat Marwick Main & Co. – New York, NY**
**Peat Marwick Main & Co. – Boston, MA**

Responsibilities included the supervision of fifty staff people on sixty audits for twelve clients. Duties included public and private reporting to the SEC and other third parties, day-to-day management of field work, oral and written presentations to top client management and Board of Directors, technical problem-solving and profit maximization. Areas of industry expertise include higher education, manufacturing, real estate and financial institutions.

**RANGE OF EXPERIENCE:**

Reviewed bankruptcy documents of various commercial entities to determine asset liquidation preference and financial viability of ongoing entity.

Served as accountant for various Chapter 11 entities, assisting with various aspects of corporate reorganization.

Served as accountant for various creditor committees in Chapter 11 proceedings to analyze fraudulent conveyance and preference issues and financial viability of ongoing entities.

Served as "Responsible Party" (Trustee) for Chapter 11 debtor in successful corporate reorganization.

Served as Receiver for corporate commercial entity and financial institutions in Arizona and California.

Served as Trustee for Chapter 11 and Chapter 7 entities.

Served as Examiner in Chapter 11 proceeding.

Prepared operating cash forecasts for commercial, municipal and non-profit businesses.

Developed financial packages used to obtain project financing.

Provided expert witness testimony, including damage analysis and accounting-related issues in commercial litigation cases dealing with lost profits, owner disputes, securities fraud, employee/employer disputes, personal injury, business interruption claims and various other matters.

Performed various fraud analyses and forensic procedures related to litigation in Ponzi schemes and employee embezzlement schemes.

Constructed damage theories including computer-generated models for commercial businesses involved in litigation.

Assisted in due diligence reviews of corporate commercial acquisitions and joint ventures.

Assisted in the preparation of SEC filings for bankrupt real estate entities.

Analysis of sole and separate property issues, hidden assets and closely held corporations in divorce settlement litigation.

**PROFESSIONAL ORGANIZATIONS:**

Member of the Arizona Society of CPA's, American Institute of Certified Public Accountants, National Association of Certified Fraud Examiners, Association of Insolvency and Restructuring Advisors. Board of Directors of Bashas, Inc.

# Exhibit "B"

**Sylvania Litigation**
**Lost Interest Analysis**


**Principal**

**Interest Rate:**            2.31%              0.00602%

| Period | 20 Year T-Bill[1] | Escrow Account Actual | Potential Lost Interest |
|--------|-------------------|-----------------------|-------------------------|
| Month 1 | $ 52,648.75 | $ 137.21 | $ 52,511.54 |
| Month 2 | 52,750.10 | 137.21 | 52,612.89 |
| Month 3 | 52,851.64 | 137.21 | 52,714.43 |
| Month 4 | 52,953.38 | 137.21 | 52,816.17 |
| Month 5 | 53,055.32 | 137.21 | 52,918.11 |
| Month 6 | 53,157.45 | 137.21 | 53,020.24 |
| Month 7 | 53,259.78 | 137.21 | 53,122.57 |
| Month 8 | 53,362.30 | 137.21 | 53,225.09 |
| Month 9 | 53,465.02 | 137.21 | 53,327.81 |
| Month 10 | 53,567.94 | 137.21 | 53,430.73 |
| Month 11 | 53,671.06 | 137.21 | 53,533.85 |
| Month 12 | 53,774.38 | 137.21 | 53,637.17 |
| **Total Year 1** | **$ 638,517** | **$ 1,647** | **$ 636,871** |
| Month 1 | 53,877.90 | 137.21 | $ 53,740.69 |
| Month 2 | 53,981.61 | 137.21 | 53,844.40 |
| Month 3 | 54,085.53 | 137.22 | 53,948.31 |
| Month 4 | 54,189.64 | 137.22 | 54,052.42 |
| Month 5 | 54,293.95 | 137.22 | 54,156.73 |
| Month 6 | 54,398.47 | 137.22 | 54,261.25 |
| Month 7 | 54,503.19 | 137.22 | 54,365.97 |
| Month 8 | 54,608.11 | 137.22 | 54,470.89 |
| Month 9 | 54,713.23 | 137.22 | 54,576.01 |
| Month 10 | 54,818.55 | 137.22 | 54,681.33 |
| Month 11 | 54,924.08 | 137.22 | 54,786.86 |
| Month 12 | 55,029.80 | 137.22 | 54,892.58 |
| **Total Year 2** | **$ 653,424** | **$ 1,647** | **$ 651,777** |
| **Total Years 1 & 2** | **$ 1,291,941** | **$ 3,293** | **$ 1,288,648** |

Footnotes:

(1) 20-year treasury rate released April 21, 2015 by the Federal Reserve (http:www.federalreserve.gov/releases/h15/update)